In re **RAYTHEON SECURITIES LITIGATION.**

No. Civ.A. 99–12142–PBS.

United States District Court,
D. Massachusetts.

Aug. 29, 2001.

Glen DeValerio, Jeffrey C. Block, Patrick T. Egan, Berman, DeValerio & Pease, Boston, MA, Paul O. Paradis, Wolf Popper Wolf Ross & Jones, New York, NY, Mark D. Smilow, Joseph H. Weiss, Weiss & Yourman, New York, NY, Mark C. Gardy, Abbey, Gardy & Squitieri, LLP, New York, NY, Stacey L. Mills, Bryan L. Crawford, Samuel D. Heins, Heins Mills & Olson, P.L.C., Minneapolis, MN, for Sidney Meisel.

Salvatore J. Graziano, Steven G. Schulman, Jared Specthrie, Milberg Weiss Bershad Hynes & Lerach LLP, New York, NY, for New York State Common Retirement Fund.

John F. Batter, III, Jeffrey B. Rudman, Richard J. Rosensweig, Hale & Dorr, Boston, MA, Eric D. Levin, Hale and Dorr LLP, Boston, MA, for Daniel P. Burnham, Franklyn A. Caine.

### MEMORANDUM AND ORDER

SARIS, District Judge.

Lead plaintiff, the New York State Common Retirement Fund, brings this securities action against Raytheon Company, various individual corporate officers, and the accounting firm PricewaterhouseCoopers LLP, alleging a fraudulent scheme that injured purchasers of Raytheon common stock between October 7, 1998 and October 12, 1999.

The sixty-four page consolidated Complaint[1] alleges that defendants issued materially false and misleading statements concerning the company's financial performance in violation of the Generally Accepted Accounting Principles, and that defendants failed to disclose numerous budget, schedule, and personnel problems that plagued several of the company's important contracts.

All defendants have moved to dismiss the Complaint on the ground that it fails to state a claim under the heightened pleading requirements of the Private Securities Litigation Reform Act of 1995 ("PSLRA"), Pub.L. No. 104–67 (1995) (codified at 15 U.S.C. § 78u–4 & –5).

After a review of the excellent briefing by all parties, and after hearing, the Raytheon defendants' motion to dismiss is **DENIED** in part and **ALLOWED** in part; PricewaterhouseCoopers' motion to dismiss is **ALLOWED.**

## I. BACKGROUND

Unless otherwise noted, the facts recited here are drawn from the Consolidated and Amended Class Action Complaint.

### A. The cast of characters

The lead plaintiff in this action is the New York State Common Retirement Fund ("NYSCRF"). NYSCRF is the second largest public pension fund in the nation and has approximately 289,046 retired and 593,188 active members. It holds $128 billion in assets. As the lead plaintiff, NYSCRF represents the interests of the class of individuals and entities who purchased the class A and/or class B common stock of Raytheon Company ("Raytheon") between October 7, 1998 and October 12, 1999 (the "Class Period"). NYSCRF purchased $161 million in stock during the Class Period.

Raytheon is a corporation headquartered in Lexington, Massachusetts. It is a major provider of products and services in the areas of defense and commercial electronics, as well as business and special

---

1. The Complaint alleges violation of Section 10(b) against all defendants (Count I) and violation of Section 20(a) of the Exchange Act against the individual defendants (Count II).

mission aircraft, and engineering and construction. Raytheon is organized into several discreet business segments.

Raytheon Engineers & Constructors ("RE & C") was a segment that, during the Class Period, comprised one of the largest engineering and construction firms in the country. However, due to certain ongoing contract performance problems, the RE & C segment was ultimately treated as a "discontinued operation" by Raytheon and was disposed of after the end of the Class Period at a substantial loss.

Raytheon Systems Company ("RSC") is the result of the 1997 combination and consolidation of the former defense operations of Hughes Electronics Corporation, the former defense assets of Texas Instruments, Raytheon E–Systems, and Raytheon Electronic Systems. At the beginning of the Class Period, RSC was the third largest United States defense contractor. The RSC segment engaged in the design, manufacture, and service of advanced electronic devices, equipment, and systems for governmental and commercial customers. RSC was eliminated as part of a reorganization following the end of the Class Period.

Raytheon Aircraft Company ("RAC") is a segment of Raytheon that manufactures, markets, and services both military and commercial aircraft.

The defendant corporate officials are described as follows: Defendant Dennis J. Picard served as Chairman of the Board, Chief Executive Officer ("CEO") of Raytheon from March 1, 1991 to December 1, 1998, when he retired as CEO. Mr. Picard continued to serve as Chairman of the Board until his retirement on July 31, 1999. Defendant Daniel P. Burnham served as President and Chief Operating Officer of Raytheon from July 1998 until December 1999. Thereafter, Mr. Burnham has served as President and CEO of Raytheon since December 1, 1998, and as

Chairman of the Board since August 1, 1999. Defendant Peter R. D'Angelo served as an Executive Vice President and the Chief Financial Officer ("CFO") of Raytheon from April 1997 to April 1999, when he retired from Raytheon. Defendant Franklyn A. Caine has served as Senior Vice President and CFO of Raytheon since April 1999. Defendant Shay D. Assad has served as an Executive Vice President of Raytheon and as the Chairman and CEO of RE & C since December 1998. From April 1998 to December 1998, Mr. Assad served as Senior Vice President of Raytheon and as the President and Chief Operating Officer of RE & C. Defendant William H. Swanson has served at all relevant times as an Executive Vice President of Raytheon and as the Chairman and CEO of RSC.

Defendant PricewaterhouseCoopers, LLP ("PwC") is a firm of certified public accountants. PwC provided an audit of Raytheon's financial statements at the end of fiscal year 1998. In addition, PwC consented to the use of its clean audit opinion letter in association with Raytheon's 1998 Financial Report and Form 10–K, which were filed by Raytheon with the Securities and Exchange Commission ("SEC").

## B. The intrigue

### 1. Alleged accounting irregularities at RE & C

Raytheon turned to its RE & C segment to bolster revenues and profits as many of its lucrative defense contracts dried up at the close of the Cold War era. Profits from RE & C proved elusive, however, as Raytheon encountered difficulties in containing costs and meeting deadlines on numerous large RE & C projects. The plaintiff alleges that defendants resorted to various accounting sleights-of-hand in order to overstate the value of RE & C and minimize the amount of necessary write-downs.

### a. Losses on major contracts in process (Group 1 contracts)

The majority of RE & C's construction and engineering projects were undertaken pursuant to long-term, fixed-price contracts. As such, if the actual project completion costs on these projects exceeded the original budget, RE & C would incur a loss to complete the project absent authorization for additional funding.

Prior to the start of the Class Period, a number of the fixed-price contracts were generating cost overruns and losses. RE & C management estimated and tracked these losses on a regular, monthly basis in internal documents called Executive Summary Reports ("ESRs") and Actionable Assets Profile Memoranda ("Actionable Asset Memos" or "AAMs"). ESRs were prepared monthly and reviewed regularly by defendants Assad, Burnham, and Picard. In addition, the ESRs were distributed on a quarterly basis to the PwC audit team. The Actionable Asset Memos were prepared on a monthly basis and distributed to the same Raytheon personnel who received the ESRs. (Significantly, there is no allegation that the PwC personnel received these Actionable Asset Memos). Both sets of documents detailed significant negative estimated profits on a number of contracts. The monthly Actionable Asset Memos contained a specific grouping of RE & C contracts where, according to the plaintiff, write-downs were required. These contracts were categorized in the August 1998 AAM as Group 1 "write-offs."

Even these negative profit estimates shown in the ESRs did not, however, reflect the true depth of RE & C's problems. The estimates were premised on the assumption that additional funding would be approved despite the fact that RE & C had been historically unsuccessful in securing such funding. For example, in August 1998, the ESRs showed that, in the aggregate, RE & C's forty largest projects would require $251 million of additional funding in order to reach a negative estimated profit to completion of $171 million. The August 1998 Actionable Asset Memo contained a detailed spreadsheet which revealed that over 75% of the losses were from RE & C's top seven contracts. Topping the list, the Saudi American General Electric ("SAMGE") PP9 power plant contract was listed with a negative estimated profit of $34,349,000 to completion, which was predicated on the assumption of securing $103,287,000 in additional funding from the client. Plaintiff alleges there was no reasonable basis for this assumption, noting that historically RE & C has been successful in collecting only 20–30% of the additional funding it had requested from its clients.

According to the plaintiff, the defendants violated both Generally Accepted Accounting Procedures ("GAAP")[2] and Raytheon's own accounting policies in an effort to mask the extent of the losses that were occurring on RE & C contracts. Raytheon's publicly stated policy was to account for RE & C's long-term, fixed-price contracts under a percentage-of-completion method, which requires that incurred costs recorded by the company as work is performed and costs plus estimated gross margin are recorded as sales, thereby providing for the recognition of estimated profits throughout the perfor-

---

**2.** " 'Generally accepted accounting principles' are the basic postulates and broad principles of accounting pertaining to business enterprises, approved by the Financial Accounting Standards Board of the American Institute of Certified Public Accountants ('AICPA'). These principles establish guidelines for measuring, recording, and classifying the transactions of a business entity." *SEC v. Price Waterhouse,* 797 F.Supp. 1217, 1222–23 n. 17 (S.D.N.Y.1992).

mance of the contract.[3] Under Raytheon's own accounting policies as described in its SEC filings, "When the current contract estimate indicates a loss, provision is made for the total anticipated loss." Those SEC filings further state: "Contracts in process are stated at cost plus estimated profit but not in excess of realizable value." Under GAAP, Raytheon was required to recognize the entire amount of any losses estimated through the entire duration of the contracts as soon as those losses became probable and could be reasonably estimated.[4] In addition, under GAAP, Raytheon could not legitimately account for additional funding unless receipt of funds in excess of the contract price was probable and could be reasonably estimated.[5]

Based on these accounting principles, plaintiff estimates that by the beginning of the Class Period Raytheon should have recognized a true loss totaling roughly $422 million on approximately 40 major contracts in process.

### b. Losses on completed contracts (Group 3 contracts)

Plaintiff also alleges that Raytheon avoided recognizing $93 million in losses on ten inactive completed RE & C contracts. The $93 million was booked as revenues in excess of actual client payments to cover cost overruns previously incurred. The August 1998 Actionable Asset Memo categorized these contracts as "Group 3," or contracts that are subject to litigation or alternative dispute resolution ("ADR").

According to the plaintiff, the $93 million should have been written down as a loss in accordance with GAAP and Raytheon's own internal policies because there was no reasonable expectation of a recovery in that amount.[6] For example, Raytheon failed to write off the Saudi Aramco Seawater Project until October 1999 although it was a closed project, it was in arbitration, and the historic relationship with the customer, as well as the contract terms, made recovery improbable.

### c. Recognition of revenues and profits on anticipated contracts (Group 5 contracts)

By August 1998, Raytheon had caused RE & C to recognize approximately $83

---

3. The percentage-of-completion method of accounting must be distinguished from the completed-contract method, under which income is recognized only when the contract is completed or substantially completed. The percentage-of-completion method is generally considered superior because it reflects more accurately the relationship between gross profit from contracts and related costs incurred over the period of the contract. *See* FASB Statement of Position 81–1, "Accounting for Performance of Construction–Type and Certain Production–Type Contracts" ("SOP 81–1"), ¶ 22.

4. *See* Financial Standards Accounting Board ("FASB"), Statement of Financial Accounting Standards No. 5, "Accounting for Contingencies" ("SFAS No. 5"), ¶ 8 (requiring that an estimated loss shall be accrued by a charge to income if, based on the available information,

the loss is probable and the amount of the loss can be reasonably estimated); SOP 81–1, ¶ 24 ("For a contract on which a loss is anticipated, generally accepted accounting procedures require recognition of the entire loss as soon as the loss becomes evident.").

5. *See* SOP 81–1, ¶ 65 ("Recognition of amounts of additional contract revenue relating to claims is appropriate only if it is probable that the claim will result in additional contract revenue and if the amount can be reliably estimated.").

6. *See* SOP 81–1, ¶ 65 ("Recognition of amounts of additional contract revenue relating to claims is appropriate only if it is probable that the claim will result in additional contract revenue and if the amount can be reliably estimated.").

million of revenues on approximately fourteen anticipated contracts. The August 1998 AAM lists these contracts in Group 5 as "win jobs." According to the plaintiff, however, these anticipated contracts had not been signed and did not represent legally binding commitments made to RE & C.[7] More importantly, by the start of the Class Period, these contracts failed to financially close.

For example, on an anticipated contract relating to the construction of a power plant in India, RE & C booked approximately $44 million of revenues and $3 million of estimated profits following the execution of a non-binding letter of intent. Those revenues and profits were billed in 1995, even though there was no funding in place for the anticipated project. As of the beginning of the Class Period, these revenues and profits were not written off despite the fact that the project never closed and was classified as inactive.[8]

The plaintiff claims the recognition of revenues and profits on the anticipated contracts violated GAAP and Raytheon's internal accounting policies. Adherence to

GAAP would require both that anticipated revenues of $83 million be removed from the books and that Raytheon take a write-down of $26 million which consisted of the actual unreimbursed costs associated with the anticipated contracts.[9]

### d. Acceleration of revenues and profits on contracts in process

The plaintiff also contends that Raytheon caused the premature booking of costs on several of its long-term contracts in order to accelerate the recognition of profits. Under the percentage-of-completion accounting method, prematurely booked costs allowed Raytheon to book the corresponding revenues and profits. These transactions were detailed in a monthly acceleration schedule that was issued to the Controller of RE & C. The schedule contained a list of contracts and the specific amount of costs accelerated on each contract.

According to plaintiff, the accelerated recognition of costs and corresponding revenues and profits violated GAAP and Ray-

---

7. Although the plaintiff cites in the Complaint fourteen contracts which they claim are non-binding, defendants submit six which they claim are binding. I agree with plaintiff that an analysis of these contracts is best left for summary judgment. However, even if a facial analysis of each contract were sufficient to rebut the strong inference of scienter required under the PSLRA, the Court does not have all fourteen contracts.

8. Plaintiff alleges that such accounting practices were endemic to other segments of Raytheon's operation as well. For example, the RSC segment booked accelerated revenue on its ASTOR contract for the United Kingdom Ministry of Defense as soon as it was selected as the preferred bidder in June 1999, yet no legally binding contract was in place until December 1999.

9. See FSAB Statement of Financial Accounting Concepts ("SFAC") No. 5, ¶ 83(b) ("revenues are considered to have been earned

when the entity has substantially accomplished what it must do to be entitled to the benefits represented by the revenues"); Accounting Principles Board ("APB") Opinion No. 10, ¶ 12 ("revenues should ordinarily be accounted for at the time a transaction is completed"); SOP 81-1, ¶ 12 ("Contracts consist of legally enforceable agreements"); id. ¶ 75a ("Costs that are incurred for a specific anticipated contract and that will result in no future benefits unless the contract is obtained should not be included in contract costs or inventory before the receipt of the contract."). Cf. also SEC Staff Accounting Bulletin No. 101 (Dec. 3, 1999) (stating that revenue should not be recognized unless pervasive evidence of an agreement exists, services have been rendered, the price is fixed or determinable, and collectibility is reasonably assured).

theon's internal accounting procedures.[10] As a result of its actions, Raytheon improperly booked $250 million in accelerated costs and—according to plaintiff's estimate—$37.5 million in accelerated profits.

#### e. Alleged inadequacy of Raytheon's write-down

On October 7, 1998, the beginning of the Class Period, Raytheon announced that, during the third quarter of 1998, it would recognize a $310 million before-tax write-down attributable to "the downturn in the engineering and construction business environment and unfavorable developments in certain contract claims at RE & C...."

Following the write-down, defendant Burnham spoke at a securities analyst conference and described the write-down as "tough medicine" and "bold action" which followed a "hard look" at the operation of RE & C over a period of "months." Defendant Burnham also stated:

> [I]f we thought there would be any more shoes to drop, we'd drop them now. We've just taken an aggressive action, a bold action.... We do not have any further expectations. Indeed, I think if we're going to be surprised in any regard, we're going to be surprised on the upside.

According to the plaintiff, however, the write-down (even on a pre-tax basis) was grossly inadequate because it fell over $250 million short of an estimated $578.5 million or more in losses that had already been quantified in Raytheon's internal accounting procedures. In addition, plaintiff alleges that defendant Burnham's state-ments relating to the write-down were materially false and misleading when made because they failed to disclose that the charges announced did not include nearly half of the losses already quantified. This charge did not include the losses attributable to the SAMGE PP9, Posven and Ratchaburi contracts in the Group 1 "write-offs" category of the August 1998 AAM.

On October 12, 1999 (the last day of the Class Period) Raytheon announced that additional charges of $125 million (after tax) would be taken as a result of "contract performance issues" on four contracts of RE & C during the third quarter of 1999. These four contracts, which included the SAMGE PP9, Posven, Ratchaburi, and Saudi Aramco projects, had been identified one year earlier in the August 1998 AAM and ESRs.

#### 2. The shortage of engineers at Raytheon Systems Company (RSC)

Prior to the Class Period, Raytheon undertook a massive consolidation and cost reduction program with respect to the RSC segment. Throughout the Class Period, RSC had a shortfall of approximately 1,000 software engineers, which prevented it from filling its billing requirements and maintaining the desired level of revenue.

On October 20, 1998, the company issued a press release which contained defendant Swanson's statement concerning RSC's cost-reduction and consolidation program: "The past nine months have shown us that we have been able to move products and programs successfully with

---

**10.** *See* SOP 81–1, ¶ 43 ("Meaningful measurement of the extent of progress toward completion is essential since this factor is used in determining the amount of the estimated contract revenue and estimated gross profit that will be recognized as earned in any given period."); *id.* ¶ 68 ("an objective of [a set of accounting procedures] should be to accumu-late costs properly and consistently by contract with a sufficient degree of accuracy to assure a basis for the satisfactory measurement of earnings."); SFAC No. 2, ¶¶ 58–59 (stating the principle that financial reporting should be reliable in that it represents what it purports to represent).

resulting significant cost reductions." In addition, during a conference call with securities analysts to review the reported 1998 third quarter results, defendant D'Angelo stated that this program was proceeding successfully "[A]s the cost savings materialize, as we are able to take those cost savings to our contracts, our margins will continue to improve as we book those." On January 26, 1999, Raytheon's press release stated that RSC had achieved the "ambitious 1988 cost-savings goals."

According to the plaintiff, although the defendants repeatedly touted the success of the RSC consolidation in these statements and quarterly reports, they never disclosed that the dearth of software engineers was directly attributable to the inhospitable employment climate created by RSC's aggressive and far-reaching consolidation program. In addition, they challenge defendant Cain's insouciant statements that he was "not worried" about meeting hiring plans for new engineers when it had 1,000 open employment requisitions of engineers it could not bill.

At the end of the Class Period, Raytheon disclosed that nearly one-third of the company's 1999 revenue shortfall—approximately $170 million—was attributable to the shortage of engineers.

### 3. Undisclosed problems with defense projects

According to the plaintiff, the defendants also misrepresented the status of several defense projects underway at Raytheon's RSC and RAC divisions. Although many of these important contracts were consistently over-budget and behind schedule, the defendants never disclosed such material information to the public.

#### a. P–3 Orion fixed-price contract

Through its E–Systems division, Raytheon was party to a key fixed-price contract under which it was to refurbish fifty of the U.S. Navy's P–3 Orion contracts. Under the terms of the contract, Raytheon was required to complete work on thirty-two of the fifty aircraft by the end of 1999 at a fixed cost of approximately $6 million per aircraft. By the end of 1999, however, only six aircraft had been completed at an actual total cost of more than $150 million (or roughly $25 million per aircraft). The project was canceled by the Navy pursuant to a stop work order issued on January 21, 2000, following an independent Navy review.

According to the plaintiff, the delays and cost overruns in the P–3 Orion contract were well known to Raytheon management throughout the Class Period. In February 1999, a special Raytheon team (dubbed "Team 30") investigated the project delays and cost overruns and immediately reported back to senior RSC management that a solution was not readily available and that the project would continue to experience problems. The historic and projected losses on the contract were also presented to defendants Swanson and Burnham and others on at least a quarterly basis.

#### b. Tactical Tomahawk fixed-fee contract

During the Class Period, the RSC segment held a $256 million cost-plus, fixed-fee contract with the U.S. Navy to engineer and manufacture a lower cost version of the Tomahawk Cruise Missile. During the course of the contract, RSC failed to meet its internal schedules and exceeded the development costs budgeted for the project. Thus, the burden of financing the remaining developments costs was borne by Raytheon. RSC also experienced material problems with guidance components

for the new missile as well as with the design for the required turbo-jet. On May 8, 2000 (after the close of the Class Period), the U.S. Navy issued documents indicating that the contract would cost approximately $41 million more than Raytheon's 1998 estimate and would take eight months longer than initially agreed to complete.

#### c. Javelin Missile fixed-price contract

During the Class Period, Raytheon was a 60% participant in a three-year, fixed-price contract valued at $763 million to produce Javelin Missiles for the U.S. Army. Although the project had been described at times as a full month ahead of schedule, Raytheon never disclosed that deliveries under the contract had been suspended as of May 1999 due to technical problems. By the end of the Class Period, approximately 497 Javelin Missiles were past due. As a result of the delays, the Army withheld all payments under the contract, totaling roughly $100 million.

#### d. Extended Range Guided Munition cost-plus contract

After Raytheon acquired the defense assets of Texas Instruments in 1996, it assumed an Extended Range Guided Munition ("ERGM") contract. During the Class Period, the ERGM contract was as much as three years behind schedule and up to 100% over budget. This delay was due to ongoing problems with various components of the ERGM. The program suffered additional problems owing to the relocation of the program from Texas to Arizona. Over 80% of the Texas-based software engineers refused to stay with the project through its relocation. Because of these issues, Raytheon was required to incur 47.5% of the additional costs associated with the ERGM contract.

#### e. RAC's JPATS Aircraft program

In 1995, Raytheon's RAC segment won a contract as a Joint Primary Aircraft Training System ("JPATS") supplier. After signing the initial contract in 1996, Raytheon announced the signing of four development contracts that called for RAC to provide a total of 69 T–6A Texan II aircraft to the U.S. Air Force and Navy. The contracts were reportedly valued at an aggregate amount of $459 million.

Throughout the Class Period, however, the program was over budget and behind schedule owing, in large part, to problems with the aircraft engines produced by RAC's subcontractors. These problems delayed critical consumer acceptance testing by several months and caused RAC to incur at least $55 million in cost overruns.

#### f. Alleged Omissions

Plaintiff alleges that defendants failed to disclose the material cost overruns on the defense contracts in Raytheon's public comments on October 20, 1998. In addition, they allege that Swanson's specific reference to the successful movement of RSC's missile program to Tucson, Arizona failed to disclose the 3–year delay and 100 percent cost overruns caused by RSC's movement of the ERGM to that facility.

#### 4. PwC's audit

Raytheon's 1998 Annual Report, filed with the SEC and disseminated to shareholders on or about April 1, 1999, contained the following "clean" audit certification by PwC of Raytheon's financial statements contained in the Annual Report:

> In our opinion, the accompanying consolidated balance sheets and the related consolidated statements of income, of stockholders' equity, and of cash flows present fairly, in all material respects, the financial position of Raytheon Com-

pany at December 31, 1998 and 1997, and the results of their operations and their cash flows for each of the three years in the period ended December 31, 1998, in conformity with generally accepted accounting principles. These financial statements are the responsibility of the Company's management; our responsibility is to express an opinion on these financial statements based on our audits. We conducted our audits of these statements in accordance with generally accepted auditing standards which require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, and evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for the opinion expressed above.

According to the plaintiff, PwC had received, on a quarterly basis, the ESRs that quantified losses on both contracts in progress and completed contracts. In addition, PwC was presented quarterly with detailed breakdowns of RE & C's contracts in progress. Because over 70% of RE & C's required write-downs concerned its seven largest contracts, Plaintiff alleges that these documents revealed certain "reg flags" that placed PwC on notice of misstatements and deficiencies in Raytheon's financial statements. Thus notified, PwC did not investigate further and still provided an unqualified audit statement that Raytheon's financial statements complied with GAAP and that PwC's own audit complied with Generally accepted auditing standards ("GAAS").[11]

## C. Dénouement

On September 16, 1999, Raytheon issued a press release which stated that the company expected to take a charge to earnings in the range of $350–450 million (pre-tax) in third quarter 1999. According to the release, the charge would be related to "further cost reduction opportunities" at RE & C and RSC. Following the announcement, the price of Raytheon Class B common stock declined by approximately 12%; the price of Class A common stock also declined by 12%. These were the largest one-day declines in Raytheon's stock price in roughly two decades.

By the plaintiff's reckoning, the wheels finally came off the wagon on October 12, 1999, the last day of the Class Period. That morning, the Wall Street Journal published a story which reported that Raytheon was over cost and behind schedule on more than a dozen of its Pentagon fixed-price contracts. Among the contracts identified were the P–3 Orion, Tomahawk Missile, and Javelin Missile programs. *See* Anne Marie Squeo, *Raytheon hits snag on Pentagon work*, WALL ST.J., Oct. 12, 1999, at A3, col. 1.

Raytheon contacted the New York Stock Exchange and ordered the halt of trading in Raytheon stock pending an announcement and conference call. Shortly before midday, Raytheon issued a press release which stated that the company would be taking total charges against earnings of $638 million (pre-tax) to be recorded in 1999. The charge included $320 million in operating charges related to "contract performance issues" on four contracts at RSC

---

**11.** " 'Generally accepted auditing standards' are the standards prescribed by the Auditing Standards Board of the AICPA for the conduct of auditors in the performance of an examination." *Price Waterhouse,* 797 F.Supp. at 1223 n. 17.

and RE & C. The press release disclosed that reduced earnings expectations for 1999 and 2000 were due in part to "a continuing shortage of software engineers to work on revenue producing programs." Raytheon also reported that an additional charge against earnings in the amount of $30 million (pre-tax) would be recorded in 2000.

During the conference call that followed the release, defendant Burnham stated that RSC was short nearly 1,000 engineers, which accounted for $170 million of revenue shortfalls in 1999. Burnham also stated that, with regard to the Tactical Tomahawk program, there was a "technical issue involving engine development." With respect to the Javelin program, Burnham stated that Raytheon needed to find a new supplier of a "key component."

When trading resumed following these disclosures, the price of Raytheon Class A and B common stock declined nearly 50% by the close of trading. This represented a decline of nearly 70% from the Class Period high approximately three months earlier.[12]

The present action was first filed with this Court on October 14, 1999, shortly after the end of the Class Period. Thereafter, a number of similar actions were consolidated into a single action before this Court, and the Court appointed NYSCRF as lead plaintiff.

## II. LEGAL ANALYSIS

### A. Motion to dismiss standard

A court may grant dismissal only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Roeder v. Alpha Indus., Inc.*, 814 F.2d 22, 25 (1st Cir.1987) (quoting *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). The Court must "take the allegations in the complaint as true and grant all reasonable inferences in favor of the plaintiff." *Monahan v. Dorchester Counseling Ctr., Inc.*, 961 F.2d 987, 988 (1st Cir.1992); *see also Greebel v. FTP Software, Inc.*, 194 F.3d 185, 200 (1st Cir.1999).

### B. Rule 9(b) and the PSLRA

■ Under § 10(b) and Rule 10b–5 of the Securities Exchange Act of 1934, it is unlawful for any person, directly or indirectly, to commit fraud in connection with the purchase or sale of securities.[13] 15 U.S.C. § 78j; 17 C.F.R. § 240.10b–5. "To state a cause of action under § 10(b) and Rule 10b–5, a plaintiff must plead ... that the defendant made a false statement or omitted a material fact, with the requisite scienter, and that the plaintiff's reliance on this statement or omission caused the plaintiff's injury." *Gross v. Summa Four, Inc.*, 93 F.3d 987, 992 (1st Cir.1996).

■ Since this securities action is a claim sounding in fraud, it is subject to the heightened pleading requirements of Fed. R.Civ.P. 9(b). *See Suna v. Bailey Corp.*,

---

**12.** Quite recently, Raytheon announced that it would take a $177 million charge stemming from projects that it was obligated to take back after they were abandoned by Washington Group International, the purchaser of Raytheon's RE & C division. *See Raytheon to Take $177 Million Charge*, N.Y. TIMES, June 28, 2001, at C2. Raytheon subsequently upped the charge to $308 million in connection with a revised estimate of completing the abandoned jobs. *See Raytheon to pay $633M to finish jobs*, BOSTON GLOBE, August 16, 2001, at 39.

**13.** The plaintiff has also asserted a claim against each of the individual defendants as a "controlling person" under Section 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78t(a). On this motion to dismiss the defendants have attacked only the allegations concerning primary liability under Section 10 and Rule 10b–5.

107 F.3d 64, 68 (1st Cir.1997). Rule 9(b) provides that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally." Fed.R.Civ.P. 9(b). The particularity requirement of Rule 9(b) serves three primary purposes: "(1) to place the defendants on notice and enable them to prepare meaningful responses; (2) to preclude the use of a groundless fraud claim as a pretext to discovering a wrong or as a 'strike suit'; and (3) to safeguard defendants from frivolous charges which might damage their reputations." *New England Data Servs., Inc. v. Becher*, 829 F.2d 286, 289 (1st Cir.1987).

■ The First Circuit has been "especially strict in demanding adherence to Rule 9(b) in the securities context...." *Gross*, 93 F.3d at 991. Where an allegation of fraud is based only on information and belief, the complaint must set forth the source of the information and the reasons for the belief. *See Romani v. Shearson Lehman Hutton*, 929 F.2d 875, 878 (1st Cir.1991). In short, a claim of fraud must "set forth specific facts that make it reasonable to believe that defendant knew that a statement was materially false or misleading." *Shaw v. Digital Equip. Corp.*, 82 F.3d 1194, 1223–24 (1st Cir.1996) (citations omitted).

■ The PSLRA erects additional pleading hurdles by requiring that the plaintiff's complaint must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u–4(b)(1). In order to allege scienter adequately under the PSLRA, the complaint must, with respect to each allegedly fraudulent act or omission, "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Id.* § 78u–4(b)(2). Accordingly, under the PSLRA and Rule 9(b) case law, a mere *reasonable* inference of scienter is insufficient to survive a motion to dismiss: the inference must be both *reasonable* and *strong*. *See Greebel*, 194 F.3d at 196–97. Determining whether the complaint's allegations raise a strong inference of scienter requires a fact-specific approach, and the plaintiff is not bound to follow any precise pattern or method of establishing unlawful intent. *See id.* at 195–96; *accord Helwig v. Vencor, Inc.*, 251 F.3d 540, 551–52 (6th Cir.2001) (en banc) ("Because Congress did not endorse or prohibit a particular manner of pleading, we cannot disregard any set of facts as insufficient as a matter of law.").

■ In evaluating a motion to dismiss, the Court may consider documents pertinent to the action or referenced in the complaint. *See Romani*, 929 F.2d at 879 n. 3 (considering pertinent public offering materials submitted with the defendants' motion to dismiss, even though the plaintiff did not attach a copy of the offering materials to his complaint); 5 C. Wright & A. Miller, *Federal Practice & Procedure* § 1327, at 761–65 (2d ed.1990). Indeed, as the process of evaluating motions to dismiss under the exacting standards of the PSLRA comes to look more and more like that of ruling on full-blown motions for summary judgment, consideration of documents referenced in the complaint has become *de rigueur*. This could be the poster case for efforts of the defendants to transform a motion to dismiss by arguing inferences from reams of such material.

## C. Raytheon Defendants

The Raytheon defendants have moved for dismissal of the entire Complaint.

They argue that it fails to state a claim and that the allegations fail to pass muster under the heightened pleading standards of the PSLRA.

### 1. Accounting statements

■ Plaintiff alleges that the data contained in the ESRs and August 1998 AAM quantified improperly recognized revenue and significant losses that were never written down by Raytheon. By failing to recognize these losses in violation of GAAP, the Raytheon defendants allegedly made false statements during the Class Period in numerous documents that materially misstated the company's financial situation, including: the October 7, 1998 write-down announcement; the 1998 third quarter results; the 1998 fourth quarter and year-end results; the 1998 Form 10–K and annual report and audit opinion; the 1999 first quarter results; and the 1999 second quarter results.

The defendants' first line of defense is to argue that no GAAP violation occurred and that the ESRs and AAMs do not in fact support the plaintiff's contentions. However, these documents are not self-explanatory or clear on their face. Through the use of these internal accounting documents, the plaintiff has alleged with great detail the manner in which the defendants improperly recognized revenue and, in other circumstances, failed to recognize reasonably estimable losses that were probable to occur. The plaintiff's interpretation of the internal documents is at least as plausible as the interpretation offered by the defendants. It therefore would be improper at the motion to dismiss phase—where the Court must take all of the plaintiff's well-pleaded allegations as true—to prefer the defendants' explanation of the financial documents over that of the plaintiff. *See In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1421 (3d Cir.1997) ("[I]t is a factual question whether [the defendant's] accounting practices were consistent with GAAP."); *SEC v. Caserta*, 75 F.Supp.2d 79, 91 (E.D.N.Y. 1999) ("Whether GAAP has been violated is a fact-specific issue.").

■ Secondly, Raytheon argues that, even assuming the existence of GAAP violations, the accounting lapses alleged do not raise a strong inference of scienter. As a general matter, while violations of GAAP provide *evidence* of scienter, *see Greebel*, 194 F.3d at 203, a "defendant's failure to recognize revenue in accordance with GAAP does not, by itself, suffice to *establish* scienter." *Chalverus v. Pegasystems, Inc.*, 59 F.Supp.2d 226, 233 (D.Mass. 1999) (citation omitted and emphasis added). Rather, the court must determine "whether the alleged GAAP violations, combined with other circumstances indicative of fraudulent intent, raise a strong inference that the defendants acted with scienter." *Id.* at 233. Such "other circumstances" may include: the magnitude of the accounting overstatement; violations of the internal accounting policies; omissions of fact from public statements; and a motive and opportunity to commit fraud. *See Gelfer v. Pegasystems*, 96 F.Supp.2d 10, 14–15 (D.Mass.2000) (citing *Chalverus*, 59 F.Supp.2d at 234–37).

Raytheon plays up the notion that the requirements of GAAP are not self-executing and that their application involves a large measure of judgment and guesswork. *See Greebel*, 194 F.3d at 205 ("Generally accepted accounting principles ... tolerate a range of reasonable treatments, leaving the choice among alternatives to management.") (citations and quotations omitted). To be sure, the application of several of the accounting principles at issue here depends upon both a reasonable assessment of the probability of gain or loss and a reasonable valuation of the amount of the

gain or loss. *See, e.g.,* SFAS No. 5, ¶ 8 (requiring write-down of a loss if, based on the available information, the loss is probable and the amount of the loss can be reasonably estimated); SOP 81–1 ¶ 24 ("For a contract on which a loss is anticipated, [GAAP] requires recognition of the entire loss as soon as the loss becomes evident."); *id.,* ¶ 65 (recognition of "revenue relating to claims is appropriate only if it is probable that the claim will result in additional contract revenue and if the amount can be reliably estimated."). And some of the rules at issue seem even more malleable. *See, e.g.,* SFAC No. 2, ¶¶ 58–59 (stating principle that financial reporting should be reliable in that it represents what it purports to represent). Raytheon argues that, because GAAP require a fair degree of leeway, any inference of scienter based on the GAAP violations alleged here would not have the requisite strength to survive dismissal under the standards of the PSLRA.

The fact that the application of GAAP tolerates a range of reasonable treatments does not, however, vindicate the defendants so easily. There are indeed numerous occasions for judgment calls in the application of GAAP. But GAAP are intended to provide a reliable degree of predictability, and an application of GAAP that strays beyond the boundaries of reasonableness will provide evidence from which scienter can be inferred. The First Circuit, although noting the malleability of GAAP, did not hesitate to hold that "[v]iolations of GAAP standards ... could provide evidence of scienter." *Greebel,* 194 F.3d at 203.

Moreover, the plaintiff has not alleged a mere technical violation of one of GAAP's proscriptions. Instead, the Complaint details numerous instances of accounting legerdemain that all serve to overstate the ledger of RE & C. *See In re MicroStrate-*

*gy Inc. Sec. Litig.,* 115 F.Supp.2d 620, 634 (E.D.Va.2000) (noting that "pervasiveness" of accounting irregularities supports inference of scienter). The magnitude of the accounting overstatement resulting from the combination of these alleged GAAP violations is also quite significant—more than $200 million in excess of the October 1998 write-down of $310 million. Defendants argue that the magnitude is not so great because the better comparison is between the $310 million write-down and the claim that the AAM purportedly required a $422 million write-down. However, even this comparison shows a significant GAAP. *See Gelfer,* 96 F.Supp.2d at 16 ("The magnitude of the revenue overstatements during the class period ... tends to support a strong inference of scienter."). *Accord Chalverus,* 59 F.Supp.2d at 233; *Marksman Partners v. Chantal Pharm. Corp.,* 927 F.Supp. 1297, 1314 (C.D.Cal. 1996); *Rehm v. Eagle Fin. Corp.,* 954 F.Supp. 1246, 1255 (N.D.Ill.1997). In addition, plaintiff alleges that a majority of the accounting irregularities related to RE & C's seven largest contracts in process. *See In re MicroStrategy,* 115 F.Supp.2d at 634 (stating that inference of scienter may be strengthened by "the importance of the contracts involved"). Most significantly, the inference of scienter is considerably strengthened by the divergence between the losses recognized on Raytheon's internal documents labeled "Group 1 Write Offs" and the information that was made available to the public. *See Greebel,* 194 F.3d at 203. Raytheon claims that the documentation attached to the AAM and ESRs shows that Raytheon realistically "expected" to recover almost all of the $251 million and had made claims for reimbursement. This assertion is belied, however, by the listing of these contracts as "write-offs" in Group 1. By contrast, the August 1998 AAM lists several contracts under Group 2 as "possible" write-offs.

The use of the term "possible" to describe the Group 2 contracts and its omission in describing Group 1 contracts speaks volumes. With all the reasonable inferences drawn in favor of plaintiff, the contrast between the descriptions of Group 1 and Group 2 creates a strong inference of contemporaneous knowledge of a serious GAAP problem.

Thus, plaintiff has adequately alleged a claim with regard to the accounting irregularities at RE & C.[14]

### 2. Promise of no future write-downs

■ Immediately following the October 7, 1998 write-down that marks the beginning of the Class Period, defendant Burnham spoke at a securities analyst conference and described the write-down as "tough medicine" and "bold action" which followed a "hard look" at the operation of RE & C over a period of "months." Defendant Burnham stated further:

> [I]f we thought there would be any more shoes to drop, we'd drop them now. We've just taken an aggressive action, a bold action. . . . We do not have an further expectations. Indeed, I think if we're going to be surprised in any regard, we're going to be surprised on the upside.

According to the plaintiff, Burnham's statement amounted to a promise that no future write-downs would be necessary and, as such, was knowingly false and misleading when made. The defendants insist that the statement was at most a nonactionable soft projection upon which no reasonable investor would rely. *See Shaw,* 82 F.3d at 1217–18 (holding that loosely optimistic statements are non-actionable as a matter of law).

Defendant Burnham's statement is more than a mere hopeful projection. The statement "affirmatively communicated that [Raytheon] had tackled and solved its . . . problems." *Steiner v. Unitrode Corp.,* 834 F.Supp. 40, 44 (D.Mass.1993). If plaintiff's allegations are taken as true, there was already another "shoe[ ] to drop" at the time the statement was made, and defendant Burnham's statement to the contrary is therefore actionable. The "other circumstances" discussed above provide the strong indicia of scienter required to state a claim based on Burnham's statement.

### 3. Statements concerning RSC Consolidation and the Engineer shortage

■ The plaintiff alleges that numerous statements by the defendants concerning the consolidation at RSC amounted to materially false and misleading statements in regard to Raytheon's failure to recruit additional software engineers. At various times, Raytheon and defendants Swanson, Burnham, and Caine reported publicly on the progress of RSC's consolidation efforts. *See* Complaint ¶ 108(b) (October 7, 1998 announcement); *id.* ¶ 109(b) (defendant Burnham's October 7, 1998 conference call with analysts); *id.* ¶ 112(b) (1998 third quarter results); *id.* ¶ 118(b) (1998 fourth quarter and year-end results); *id.* ¶ 128(b) (1999 first quarter results); and *id.* ¶ 129 (defendant Caine's April 22, 1999 conference call with analysts). What the defendants did not disclose was that the ongoing consolidation was impairing Raytheon's ability to attract and retain new engineers for several important projects.

---

**14.** Because the allegations with respect to the write-offs in Group 1 at RE & C are plainly sufficient to create a strong inference of scienter, I do not address the other alleged GAAP violations like acceleration of revenue and the contracts in ADR. These are better resolved on a full record.

Defendants argue that their statements are non-actionable because they did not open the door to a duty to disclose material facts about the ongoing shortage of engineers.

 "[The duty-to-disclose rule] does not mean that by revealing one fact about a product, one must reveal all others that, too, would be interesting, marketwise, but means only such others, if any, that are needed so that what was revealed would not be 'so incomplete as to mislead.' " *Backman v. Polaroid Corp.*, 910 F.2d 10, 16 (1st Cir.1990) (en banc) (quoting *SEC v. Texas Gulf Sulphur Co.*, 401 F.2d 833, 862 (2d Cir.1968), *cert. denied,* 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1969)). "[A] duty to disclose arises only where both the statement made is material, and the omitted fact is material to the statement in that it alters the meaning of the statement." *In re Boston Tech., Inc. Sec. Litig.*, 8 F.Supp.2d 43, 53 (D.Mass. 1998).

Here, the statements concerning the success of RSC's consolidation efforts did not give rise to a duty to disclose the ongoing shortage of engineers. Although information about the shortage of engineers may have been interesting marketwise, its omission did not alter the meaning of the defendants' consistent statements that RSC was successfully restructuring and scaling down its operations.

 The plaintiff draws the Court's attention to two additional statements. The first is a statement in Raytheon's 1999 second quarter results that RSC was continuing to "aggressively" recruit new engineers for the development of new business and software development. The second is a statement by defendant Caine from a July 1999 analyst call, in which he declared that he was "not worried" about Raytheon meeting its hiring plans for new engineers. Although both statements directly concern

the hiring of new engineers, they are also non-actionable. Unlike Burnham's statement concerning the October 7, 1998 write-down, these statements are, as a matter of law, "loosely optimistic statements that are so vague, so lacking in specificity, [and] so clearly constituting the opinions of the speaker, that no reasonable investor could find them important to the total mix of information available." *Shaw*, 82 F.3d at 1217.

### 4. Non-disclosure of RSC defense contract problems

 The plaintiff also places great reliance on the duty-to-disclose rule to support its fraud claims arising from Raytheon's alleged efforts to conceal delays and cost-overruns in its Tactical Tomahawk, Javelin, ERGM, and JPATS programs. Defendants issued numerous statements describing the general contours of these contracts. *See* Complaint ¶ 124(d) (describing Tactical Tomahawk Program); *id.* ¶ 108(b) (describing restructuring related to ERGM program); *id.* ¶ 124(c) (describing JPATS program in annual report on April 1, 1999); *id.* ¶ 134(d) (indicating that Navy had exercised option on JPATS program); and *id.* ¶ 135(b) (stating that RAC's operating margin was expected to increase 11 to 12 percent as it rolled out JPAT's aircraft and that RAC had experienced growth in backlog related to JPATS program).

None of the statements, however, addresses in any detail the progress on the contracts or the schedule and budget of the contracts. Nor are the statements altered in meaning because the defendants omitted information they may have possessed about problems that were occurring on the projects. Further, it is unclear from the Complaint when the defendants had information regarding the budget and delay problems so as to make the public

statements (i.e., the April 1, 1999 annual report) materially misleading. Merely alleging "during the class period" is not particular enough to satisfy Rule 9(b) or to raise a strong inference of scienter.

■ There is, however, a notable exception concerning the P–3 Orion contract. The 1998 Annual Report issued on April 1, 1999 specifically discussed the contract schedule and ongoing delivery of the refurbished aircraft by stating:

> RSC ... has [a] major P–3 maritime patrol aircraft modernization assignment[ ]: the U.S. Navy's Sustained Readiness Program, a structural refurbishment program.... The Navy's Sustained Readiness Program calls for 50 aircraft to be refurbished by the end of 2002. The first modernized P–3 aircraft passed a rigorous flight-test and was accepted in April [1998]. The second aircraft was delivered in early 1999. In addition to the first 50 aircraft, negotiations are under way for a follow-on contract to refurbish 48 additional aircraft.

Having opened the door to discussing the schedule and progress on the contract, Raytheon was obligated to disclose the material information regarding delays and overruns that would affect RSC's ability to complete the contract in a timely fashion.

The next question that arises is whether the allegations concerning the P–3 Orion contract raise a strong inference of scienter or whether the fact that the delays failed to come to light for another six months means that plaintiff is merely attempting to plead "fraud by hindsight."

■ "Corporate officials need not be clairvoyant; they are only responsible for revealing those material facts reasonably available to them." *Novak v. Kasaks*, 216 F.3d 300, 309 (2d Cir.), *cert. denied*, 531 U.S. 1012, 121 S.Ct. 567, 148 L.Ed.2d 486 (2000). Thus, a court may not infer fraud from the mere fact that a defendant made optimistic forecasts which were followed by disclosure of results that were below expectations. *See Suna*, 107 F.3d at 71.

■ Nonetheless, even when the true state of affairs does not come to light until after the defendant's allegedly false statement, it is permissible in some instances to infer from the later disclosure that the defendant's statement was knowingly or recklessly false when made. *See, e.g., In re Grand Casinos, Inc. Sec. Litig.*, 988 F.Supp. 1273, 1283 (D.Minn.1997) ("while the underlying facts on which plaintiffs rely are not contemporaneous with defendants' allegedly false statements, they create a strong inference that defendants knew there were significant problems when the statements were made."); *In re Stratosphere Corp. Sec. Litig.*, 1 F.Supp.2d 1096, 1111 (D.Nev. 1998) (stating that there is no "bright line rule that any documents offered to allege statements were false or misleading *must* either proceed the statements or be precisely contemporaneous with them.") (emphasis in original). Some reliance on post-statement revelations is appropriate where, as here, no catastrophic event occurred between the time of the challenged statement and the revelation of the truth; it is also appropriate when the nature of the problem is such that it likely would have been apparent to management before it was disclosed to the public. *See In re Stratosphere*, 1 F.Supp.2d at 1112; *In re Grand Casinos*, 988 F.Supp. at 1283.

Moreover, the plaintiff provides allegations which, if proven, would show that Raytheon's officers had contemporaneous knowledge of the problems with the P–3 Orion contract. More specifically, the plaintiff alleges that the "Team 30" group was assembled to investigate the schedule issues and cost overruns in February 1999. The findings of the Team 30 report were

relayed immediately to senior RSC management, which was aware of the problem by March 1999. In addition, defendants Swanson and Burnham were briefed on the contract's projected losses on a quarterly basis. The defendants complain that these allegations lack the requisite particularity because, among other things, they do not identify the individuals who conducted the "Team 30" investigation. However, even the PSLRA does not require the plaintiff to engage in the type of "fact pleading" that would require total pre-discovery insight. Thus, plaintiff has stated a claim with regard to the disclosures relating to the P–3 Orion contract.

### 5. Group-published information and the liability of individual defendants

The individual Raytheon defendants argue that the plaintiff has impermissibly resorted to "group pleading" by failing to particularize each person's role in the alleged fraud as required by Fed.R.Civ.P. 9(b) and the PSLRA. *See* 15 U.S.C. § 78u–4(b)(2) ("[T]he complaint shall ... state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.").

 Under the group-published information doctrine, the plaintiff may impute false or misleading statements conveyed in annual reports, quarterly and year-end financial results, or other group-published information to corporate officers. The Ninth Circuit has described the doctrine as follows:

> In cases of corporate fraud where the false or misleading information is conveyed in ... annual reports or other 'group published information,' it is reasonable to presume that there are the collective actions of the officers. In such circumstances, a plaintiff has fulfilled the particularity requirement of Rule 9(b) by pleading misrepresentations with particularity and where possible the role of individual defendants in the misrepresentations.

*Wool v. Tandem Computers Inc.*, 818 F.2d 1433, 1440 (9th Cir.1987). The First Circuit, citing *Wool*, seems to have endorsed this concept as long as there are sufficiently particularized allegations that the individual officer knew about the fraud. *See Serabian v. Amoskeag Bank Shares, Inc.*, 24 F.3d 357, 367–68 (1st Cir.1994) (holding that acceptance of responsibility for the contents of the Annual Report demonstrated by defendants' signatures together with knowledge of conflicting information was a sufficient link to satisfy Rule 9(b)). The doctrine is limited in scope and applies only to "clearly cognizable corporate insiders with active daily roles in the relevant companies or transactions." *Polar Int'l Brokerage Corp. v. Reeve*, 108 F.Supp.2d 225, 238 (S.D.N.Y.2000).

Whether the PSLRA abolished this doctrine has been a subject of considerable debate. *See generally* William O. Fisher, *Don't Call Me a Securities Law Groupie: The Rise and Possible Demise of the "Group Pleading" Protocol in 10b–5 Cases*, 56 Bus.Law. 991 (2001). Thus far, a majority of courts facing the issue have determined that the group pleading doctrine does in fact survive the passage of the PSLRA. *See In re SmarTalk Teleservices, Inc. Sec. Litig.*, 124 F.Supp.2d 527, 545 (S.D.Ohio 2000) (holding PSLRA did not abolish group published information rule). *Accord In re Baan Co. Sec. Litig.*, 103 F.Supp.2d 1, 17 (D.D.C.2000); *In re Oxford Health Plans, Inc., Sec. Litig.*, 187 F.R.D. 133, 142 (S.D.N.Y.1999); *In re Sunbeam Sec. Litig.*, 89 F.Supp.2d 1326, 1340–41 (S.D.Fla.1999); *In re Livent, Inc. Sec. Litig.*, 78 F.Supp.2d 194, 219 (S.D.N.Y.1999); *In re BankAmerica Corp. Sec. Litig.*, 78 F.Supp.2d 976, 987 (E.D.Mo.

1999); *Zuckerman v. Foxmeyer Health Corp.,* 4 F.Supp.2d 618, 627 n. 4 (N.D.Tex. 1998); *Robertson v. Strassner,* 32 F.Supp.2d 443, 446 (S.D.Tex.1998); *In re Miller Indus., Inc. Sec. Litig.,* 12 F.Supp.2d 1323, 1329 (N.D.Ga.1998); *In re Stratosphere,* 1 F.Supp.2d at 1108; *In re Digi Int'l, Inc. Sec. Litig.,* 6 F.Supp.2d 1089, 1101 (D.Minn.1998), *aff'd,* Nos. 00–3162 & 00–3227, 2001 WL 753869 (8th Cir. July 5, 2001) (unpublished opinion); *Powers v. Eichen,* 977 F.Supp. 1031, 1040 (S.D.Cal.1997); *In re Health Mgmt., Inc. Sec. Litig.,* 970 F.Supp. 192, 208–09 (E.D.N.Y.1997). *But see P. Schoenfeld Asset Mgmt. LLC v. Cendant Corp.,* 142 F.Supp.2d 589, 620–21 (D.N.J.2001) (holding PSLRA abolished group published information rule); *Coates v. Heartland Wireless Communs., Inc.,* 26 F.Supp.2d 910, 916 (N.D.Tex.1998) (same). Although the minority view has its merits, this Court agrees with the majority of courts that have held that the rationale behind the group pleading doctrine remains sound in the wake of the passage of the PSLRA.

■ In light of the above rulings and the First Circuit's admonition in *Serbarian* that all group pleading allegations must be sufficiently particularized, the Court must evaluate the allegations concerning each of the individual defendants. The heart of the fraud charge involving RE & C is that on October 7, 1998 the "Raytheon defendants" took a one-time charge in the third quarter of 1998 knowing that the charge failed to include nearly half of the losses already quantified by RE & C management in the internal ESRs and the August 1998 AAM. The Complaint alleges defendant Assad received the monthly ESRs and AAMs and reviewed them with defendants Picard and Burnham. It also alleges that Thomas Murphy (head of Raytheon internal audit) received the ESRs and AAMs and that he reported directly to defendant D'Angelo (until April 1999) and after that to defendant Caine.

■ Defendant Caine argues that he must be dismissed because he had not even joined Raytheon at the time of the October 1998 statement. *See In re Segue Software, Inc. Sec. Litig.,* 106 F.Supp.2d 161, 169 n. 17 (D.Mass.2000) (dismissing claim against individual defendant who had joined company only after alleged GAAP violations took place). Arguably, Caine, who became a Senior Vice President and Chief Financial Officer in April 1999, had access to the regular ESR reports when reporting on the first quarter (April 22, 1999) and second quarter (July 22, 1999) of 1999. However, there is no allegation he saw or was told about the smoking-gun August 1998 AAM that lists the write-offs, or that he had sufficient knowledge regarding the probability of collection of extra funds from the clients on deficient contracts. The allegations with respect to Caine are therefore insufficient to raise a strong inference of scienter concerning the RE & C write-offs.[15]

■ In a similar vein, the defendants also argue that Swanson cannot be held

---

**15.** Some mention should be made of Caine's involvement with the ASTOR contract. Plaintiff alleged that RSC took improper cost accelerations and prematurely recognized revenue in violation of GAAP requirements in June 1999 because a legally binding contract was not signed until December 1999 and the contract was expected to generate negative cash flow during its first two-three years of operation. During a conference call on July 22, 1999, defendant Caine discussed the ASTOR program and stated (allegedly falsely) that it had not yet been recorded in RSC's financial results. There are insufficient allegations regarding the ASTOR contract to support a fraud claim. Notably, unlike the other contracts discussed in the Compliant, the ASTOR contract actually closed, and there are no allegations of what harm, if any, flowed from the alleged misrepresentation.

liable for the accounting improprieties at RE & C simply by virtue of his position as Chairman and CEO of RSC, a different segment of Raytheon. Although this argument blinks the fact that defendant Swanson was also an Executive Vice President of Raytheon throughout the Class Period, the plaintiff has not alleged that defendant Swanson received the ESRs or AAMs that purportedly disclose the accounting fraud at RE & C. Thus, the claims against Swanson regarding the RE & C accounting fraud are also dismissed without prejudice. Nonetheless, Swanson will not be dismissed from the case because there are adequate allegations that he knew about the profound problems with the P-3 Orion aircraft by March 1999. Under the group pleading rule the statements in the April 1, 1999 annual report may be imputed to him.

The Court dismisses the allegations in Count I against Caine without prejudice, but concludes sufficient particularized allegations have been made against the other individual Raytheon defendants. Because the allegations against Caine in Count II concerning controlling person liability under Section 20(a) of the Exchange Act have not been briefed, I do not dismiss him from the case.

## D. PricewaterhouseCoopers

The plaintiff has also brought a claim against PwC, alleging that the independent auditor acted recklessly in giving Raytheon a clean audit letter for its 1998 Annual Report on March 24, 1999, and that PwC did not audit Raytheon's 1998 financial statements in accordance with generally accepted auditing standards (GAAS). PwC contends, among other things, that plaintiff fails to allege facts sufficient to raise the strong inference of scienter required to state a claim.

Courts assessing claims against independent accountants and auditors under the PSLRA have placed the bar high:

> For recklessness on the part of a non-fiduciary accountant to satisfy securities fraud scienter, such recklessness must be conduct that is highly unreasonable, representing an extreme departure from the standards of ordinary care. It must, in fact, approximate an actual intent to aid in the fraud being perpetrated by the audited company.

*Rothman v. Gregor*, 220 F.3d 81, 98 (2d Cir.2000). In other words, the plaintiff "must prove that the accounting practices were so deficient that the audit amounted to no audit at all, or an egregious refusal to see the obvious, or to investigate the doubtful, or that the accounting judgments which were made were such that no reasonable accountant would have made the same decision if confronted with the same facts." *Van de Velde v. Coopers & Lybrand*, 899 F.Supp. 731, 734 (D.Mass.1995) (citations and quotations omitted). A plaintiff may satisfy this high burden by pleading with specificity that the auditor was aware of, but failed to investigate, certain "red flags" that plainly indicated misconduct was afoot. *See In re Health Mgmt.*, 970 F.Supp. at 203 (finding strong inference of recklessness where defendant allegedly failed to follow proper audit procedures, that GAAP violations led to material misstatements, and that defendant ignored numerous "red flags").

Although the question is close, a searching review of the Complaint reveals that the plaintiff has not alleged facts which raise a strong inference of scienter on the part of PwC. The plaintiff alleges that PwC received the ESRs on a quarterly basis, that the PwC audit team was presented on a quarterly basis with a detailed breakdown of RE & C's contracts in process, and that PwC reviewed the documen-

tation before the October 7, 1998 announcement. From these materials, the plaintiff argues that the losses attributable to the contracts in Group 1 (including SAMGE PP9, Posven and Ratchaburi) were apparent. This contention is supported by the plaintiff's production of the ESR dated July 24, 1997 regarding the SAMGE PP9 project, which arguably demonstrates the apparent need for write-downs (if tallied up for the forty contracts). In rebuttal PwC points out correctly that this particular ESR is relevant to only one claimed GAAP violation involving the $422 million of contracts in process.

The plaintiff argues that the magnitude of the accounting fraud at RE & C is a sufficient "red flag" from which to infer scienter. To be sure, the magnitude of the accounting fraud alleged here is significant: over 70% of RE & C's required write-downs concerned the seven largest contracts in process, which constituted one-third of the company's total contracts in process. Moreover, according to the plaintiff, the required write-downs would have caused a one time expense to 1998 income of approximately $300 million which was nearly 20% of the company's reported 1998 income before taxes.

Some courts have held that the sheer magnitude of the accounting fraud is a sufficient "red flag." *See, e.g., In re Leslie Fay Companies, Inc. Sec. Litig.*, 835 F.Supp. 167, 175 (S.D.N.Y.1993). In the wake of the PSRLA, however, "red flags" generally constitute something more than the accounting violation itself. *See Rehm*, 954 F.Supp. at 1255 (stating that plaintiff must provide allegations "in addition to bare allegations of GAAP violations" to support scienter); *Queen Uno Ltd. P'shp. v. Coeur D'Alene Mines Corp.*, 2 F.Supp.2d 1345, 1361 (D.Colo.1998) ("[W]ithout additional allegations of particular facts and circumstances[,] violations of

GAAP and GAAS generally do not give rise to an inference of scienter."). For instance, there is no allegation that PwC knew Raytheon's own internal audit controls to be skimpy or non-existent, *see Great Neck Capital Apprec. Inv. P'ship, LP v. PricewaterhouseCoopers, LLP*, 137 F.Supp.2d 1114, 1124 (E.D.Wis.2001) (noting that auditor had knowledge of lack of internal controls); that PwC ever butted heads with Raytheon over the company's accounting practices, *see In re Livent, Inc. Sec. Litig.*, 98 Civ. 5686, 148 F.Supp.2d 331, 370, 2001 U.S. Dist. LEXIS 8949, at *112–13 (S.D.N.Y. June 29, 2001) (noting company's repeated failure to comply with auditor's requests for financial documents); or that Raytheon's accounting practices were ever called into question by any inside or outside source in a manner that would give a reasonable auditor pause, *see In re Health Mgmt.*, 970 F.Supp. at 203 (noting that accountant had a letter from an analyst specifically warning that the client had improperly inflated its accounts receivable); *In re Ikon Office Solutions, Inc. Sec. Litig.*, 66 F.Supp.2d 622, 629 (E.D.Pa.1999) (noting that accountant's own file contained handwritten notes revealing that the client's management told the accountant that an employee was "cooking the books.").

The magnitude of the misstatement, combined with the internal documents (particularly the ESRs), at most supports a garden-variety inference of recklessness or a strong inference of negligence—but that is not enough. *See In re SmarTalk*, 124 F.Supp.2d at 519 ("[S]uch allegations, although possibly sufficient to plead negligence, are insufficient to establish the strong inference of scienter necessary to state a securities fraud case."); *see also Reiger v. Price Waterhouse Coopers, LLP*, 117 F.Supp.2d 1003, 1013 (S.D.Cal.2000) (dismissing claim where "Plaintiffs' purported 'red flags' consist of [auditor]'s pos-

session of documentation which, if properly reviewed pursuant to GAAP and GAAS, would have revealed improperly recognized revenue."). The crux of the dispute is whether Raytheon's assumption in the ESRs that it would receive an additional $251 million in funding was so unreasonable as to support a *strong* inference of willful blindness by PwC. Critically lacking are the allegations which nail the coffin against Raytheon.[16] There is no allegation that PwC knew: (1) that the August 1998 AAM acknowledges these contracts as write-downs (not mere "possible" write-downs); (2) that the historical data demonstrated that RE & C had collected only 20–30% of additional funding; and (3) that the information about specific contracts showed that collecting additional funding for the Group 1 contracts was a longshot. The Complaint is dismissed without prejudice against PwC.

## III. CONCLUSION AND ORDER

For the reasons stated above, the Raytheon defendants' motion to dismiss (Docket No. 50) is *ALLOWED* in part and *DENIED* in part. Count I of the Complaint against defendant Caine is *DISMISSED* without prejudice. PwC's motion to dismiss (Docket No. 45) is *ALLOWED* without prejudice.

---

**16.** It may be that during discovery concerning the pending claims against Raytheon, the plaintiff may derive a good factual basis (i.e., access to the August 1998 AAM or later AAMs) for making sufficient allegations against PwC to hoist the red flag up the pole.