### In re ALLAIRE CORPORATION SECURITIES LITIGATION

No. CIV.A. 00–11972–WGY.

United States District Court,
D. Massachusetts.

Sept. 27, 2002.

Daniel E. Bacine, Barrack, Rodos & Bacine, Philadelphia, PA, Peter E. Seidman, Samuel H. Rudman, Steven G. Schulman, Milberg Weiss Bershad Hynes & Lerach LLP, New York, NY, Alfred G. Yates, Jr., Law Office of Alfred G. Yates, Jr., Pittsburgh, PA, Jeffrey S. Abraham, Stephen Moulton, Nancy Freeman Gans, Moulton & Gans, LLP, Boston, MA, Adkins, Kelston & Zavez, P.C., Boston, for Neil Krakauer, on behalf of himself and all others similarly situated, Plaintiff.

Daniel E. Bacine, Barrack, Rodos & Bacine, Philadelphia, PA, Alfred G. Yates, Jr., Law Office of Alfred G. Yates, Jr., Pittsburgh, PA, Jeffrey R. Krinsk, Finkelstein & Krinsk, San Diego, CA, for David J. Dargenzio.

Jeffrey R. Krinsk, Finkelstein & Krinsk, San Diego, CA, David Pastor, Gilman and Paster, LLP, Saugus, MA, for Monique Winters, David Holmes.

Daniel E. Bacine, Barrack, Rodos & Bacine, Philadelphia, PA, Stephen Moulton, Nancy Freeman Gans, Moulton & Gans, LLP, Boston, MA, Jonathan M. Stein, Cauley, Geller, Bowman & Coates, LLP, Little Rock, AR, David L. Kelston, Adkins, Kelston & Zavez, P.C., Boston, MA, for Alan Grodon, Antonio DeMaggio.

Fred Isquith, Gregory M. Nespole, Katherine B. DuBose, Wolf, Haldenstein, Adler, Freeman & Herz, New York City, Stephen Moulton, Nancy Freeman Gans, Moulton & Gans, LLP, Boston, MA, for Craig Scott Large.

Jules Brody, Stull, Stull & Brody, New York City, Stephen Moulton, Nancy Freeman Gans, Moulton & Gans, LLP, Boston, MA, Joseph H. Weiss, Weiss & Yourman, New York City, Timothy J. Burke, Michael D. Braun, Stull, Stull & Brody, Los Angeles, CA, David L. Kelston, Adkins, Kelston & Zavez, P.C., Boston, MA, for Jeff Knorr.

Daniel E. Bacine, Barrack, Rodos & Bacine, Philadelphia, PA, Matthew M. Houston, Robert I. Harwood, Wechsler, Harwood, Halebian & Feffer, LLP, New York City, Stephen Moulton, Nancy Freeman Gans, Moulton & Gans, LLP, Boston, MA, Bruce G. Murphy, Law Offices of Bruce G. Murphy, Vero Beach, FL, for Chris Jarvis.

Daniel E. Bacine, Barrack, Rodos & Bacine, Philadelphia, PA, Jeffrey Kodroff, Anthony Chue, Spector & Roseman, Stephen Moulton, Nancy Freeman Gans, Moulton & Gans, LLP, Boston, MA, Evan J. Smith, Brodsky & Smith, LLC, Bala Cynwyd, PA, David L. Kelston, Adkins, Kelston & Zavez, P.C., Boston, MA, for Karen Cordeiro.

Daniel E. Bacine, Barrack, Rodos & Bacine, Philadelphia, PA, Stephen Moulton, Nancy Freeman Gans, Moulton & Gans, LLP, Boston, MA, Marc S. Henzel, Law Offices of Marc S. Henzel, Philadelphia, PA, David L. Kelston, Adkins, Kelston & Zavez, P.C., Boston, MA, for Howard B. Fisher.

Thomas G. Shapiro, Shapiro, Haber & Urmy LLP, Boston, MA, for Howard Reagor, Karl G. Lindgren.

Thomas V. Urmy, Jr., Shapiro Haber & Urmy, LLP, Boston, MA, Dennis J. Johnson, Johnson & Perkinson, South Burlington, VT, for Lola Crippin.

Peter A. Lagorio, Gilman & Pastor, LLP, Saugus, MI, for Abraham S. Kassin.

William H. Paine, Jeffrey B. Rudman, Jonathan A. Shapiro, Gregory P. Teran, Hale & Dorr, Boston, MA, for Allaire Corp.

William H. Paine, Jeffrey B. Rudman, Jonathan A. Shapiro, Hale & Dorr, Boston, MA, for Joseph J. Allaire, Jeremy Allaire, David A. Gerth, David J. Orfao.

## MEMORANDUM

YOUNG, Chief Judge.

## I. INTRODUCTION

"In 1995, Congress enacted legislation attempting to wrest control over securities fraud class action lawsuits from the plaintiffs' bar devoted to such litigation and confer it upon counsel for larger institutional investors. *See* Private Securities Litigation Reform Act ('PSLRA'), Publ. L. No. 104–67 codified at 15 U.S.C. § 78u–4 (1995). Such a measure, it was believed, would cut down on frivolous litigation.... While at it, Congress raised the hurdle a plaintiff would have to jump before being permitted to present her case to a jury." *Lirette v. Shiva Corp.*, 27 F.Supp.2d 268, 271 (D.Mass.1998) (footnotes omitted). This tale of hopes dashed among the cratered remains of the dot.com era suggests that the lustre of this so-called "reform" may be tarnished.

This class action is asserted on behalf of the class (the "Plaintiffs")[1] of individuals who purchased Allaire Corporation common stock between December 7, 1999, and September 18, 2000 (the "Class Period"). The Defendants, Allaire Corporation ("Allaire") and its four corporate officers (the "Individual Defendants," collectively with Allaire, the "Defendants"), are alleged to have made false and misleading statements in violation of relevant securities law. The Plaintiffs seek recovery on two counts: violation of section 10(b) and Rule 10b–5 of the Securities Exchange Act of 1934 ("Exchange Act"); and violation of section 20(a) of the Exchange Act (control person liability).

The Court dismissed the original complaint, but granted leave to amend so that the Plaintiffs could conform their pleadings to the heightened pleading standards

---

1. No class has yet been certified.

required by Federal Rule of Civil Procedure 9(b) and the PSLRA. The Plaintiffs submitted an amended complaint, which the Defendants promptly moved to dismiss for various reasons, primarily asserting that it still failed to comport with the heightened pleading requirements of Rule 9(b) and the PSLRA. The Court denied the Defendants' motion to dismiss in an Order dated June 19, 2002 [Docket No. 85]. This memorandum explains the Court's order.

## II. BACKGROUND

As this is a motion to dismiss, the Court is obliged to take all facts "in the light most favorable to" the Plaintiffs—the non-moving party—regardless of the fact that the claims arise in the securities litigation context. *Aldridge v. A.T. Cross Corp.*, 284 F.3d 72, 75 (1st Cir.2002) (citing *Doe v. Walker*, 193 F.3d 42, 42 (1st Cir.1999)).

Allaire is a software manufacturer and, like so many of its siblings, is traded on NASDAQ. As such, Allaire was subject to the periodic reporting requirements of the Exchange Act (codified at 77 U.S.C. § 1001 et seq.). This is not a case relating to deceptive securities offerings; rather, it is a case about failing to disclose bad news to investors in periodic reports filed with the Securities and Exchange Commission ("SEC"), and making optimistic public statements when corporate officers allegedly knew that all reason for optimism had vanished.

Allaire came to prominence as a result of a product named ColdFusion. ColdFusion was a "software program that hosted web applications and enabled access to these applications through a web browser or other application." Compl. ¶ 15. In plain language, it is a program that enables users to make web pages. One of the features of ColdFusion is that it provided a simple-to use-format within which

less computer-savvy individuals could conduct website development. *Id.* Most websites use Hyper–Text Markup Language ("HTML"), which is apparently quite complicated. ColdFusion, however, enabled users to create websites using ColdFusion Markup Language ("CFML").

ColdFusion, unfortunately for Allaire, was a very low-profit margin product, and both the Defendants and industry analysts considered a new product, Spectra, to be the future of the company. In essence, Spectra is an industrial version of ColdFusion—a large scale web-design program that was designed to accommodate business-to-business ("B2B") websites. It was a high-profit margin product. While ColdFusion sold for mere hundreds of dollars, Spectra sold for tens of thousands of dollars. In late 1999, Allaire announced that it would be releasing Spectra. *Id.* at ¶ 16. As a result of anticipation in the marketplace, allegedly created by statements made by the Defendants, Allaire's stock price rose considerably.

The crux of the Plaintiff's complaint is that, while Spectra's development was progressing, there were substantial problems with its program and production. These problems significantly impacted the performance of, and consequentially customer demand for, the program. These problems were never disclosed to investors or consumers, however, and thus Allaire's stock was traded at artificially inflated prices. Moreover, in addition to not disclosing the bad news, Allaire issued a continued series of press releases, SEC filings, and earnings reports that painted a rosy picture for the future—a future that all concerned knew depended on Spectra sales. Meanwhile, as the investing public purchased Allaire shares on the belief that Allaire was producing the next Windows, the individual Defendants were selling their shares of Allaire common stock and

negotiating a sale of the company—cashing in and bailing out before the negative information to which they were privy was disclosed.

The Plaintiffs point to four categories of statements that they allege were false and misleading. First, the Plaintiffs allege that the Defendants made false and misleading statements about the capabilities and status of the development of Spectra. Second, the Defendants allegedly misrepresented their ability to support Spectra, primarily in overstating their level of customer support and the like. Third, the Defendants allegedly misrepresented the marketability of Spectra—that is, how well it was anticipated to sell. Last, the Defendants allegedly misrepresented Allaire's position to analysts during the Third Quarter of 2000, resulting in misleading analyst statements.

On their part, the Defendants claim to detect seven defects in the Plaintiffs' complaint which collectively prove fatal and warrant dismissal. First, the Defendants contest the propriety of most of the complaint, alleging that it fails to comply with the heightened pleading standards of Rule 9(b) and the PSLRA. Second, the Defendants contend that many of the allegedly false statements were mere puffing or were not false. Third, the Defendants contend that the core assertion of fraud by failure to disclose software bugs is unactionable as pled. Fourth, the Defendants contend that the Class has failed to plead loss causation. Fifth, the Defendants contend the Class has failed to plead facts sufficient to establish their liability for the comments of securities analysts. Sixth, the Defendants contend that the complaint

fails to plead scienter. Seventh, and last, the Defendants claim that the individuals cannot be held liable.

## III. DISCUSSION

### A. Standard of Review

In examining a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), the Court must "take the allegations in the complaint as true and grant all reasonable inferences in favor of the plaintiff." *Lirette v. Shiva Corp.*, 27 F.Supp.2d. 268, 274 (D.Mass.1998) (citing *Monahan v. Dorchester Counseling Ctr.*, 961 F.2d 987, 988 (1st Cir.1992)). "The Court may grant dismissal only if 'it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'" *Id.* (citing *Roeder v. Alpha Indus.*, 814 F.2d 22, 25 (1st Cir.1987) (quoting *Conley v. Gibson*, 355 U.S. 41, 45–6, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957))). "Although the pleading requirements of the PSLRA are strict, they do not change the standard of review for a motion to dismiss. Even under the PSLRA, the district court, on a motion to dismiss, must draw all reasonable inferences from the particular allegations in the plaintiff's favor, while at the same time requiring the plaintiff to show a strong inference of scienter." *Aldridge v. A.T. Cross Corp.*, 284 F.3d 72, 78 (1st Cir.2002)(internal and external citations omitted).

### B. Pleading Requirements

Simply put, the combination of the PSLRA and Rule 9(b) has—unfortunately, in the view of this Court [2]—changed securities fraud actions from notice-based pleading to the intricate, formalistic style

---

**2.** *See In Re Number Nine Visual Technology Corp. Securities Litigation,* 51 F.Supp.2d 1, 27–28 n. 22 (D.Mass.1999) (noting that "under the Byzantine pleading code established in recent years by Congress and the courts for

securities actions,...the gamesmanship required to plead a successful securities claim has taken on a dimension reminiscent of pre-Federal Rules pleading practice.").

required of form-based pleading—the very system abandoned by the "modern" Federal Rules of Civil Procedure. Rule 9(b) applies to all fraud-based actions, including both claims here, and requires pleading with special particularity. The PSLRA applies only to securities fraud cases, including both claims here, and requires that special elements be pled with sufficient factual background.

■ "It is well settled that Rule 9(b) requires the plaintiff ... to specify the time, place, and content of an alleged false representation." *Romani v. Shearson Lehman Hutton*, 929 F.2d 875, 878 (1st Cir.1991) *superseded by* the Private Securities Litigation Reform Act (PSLRA), 15 U.S.C. § 78u–4(b)(1)–(2) (1997). *See Greebel v. FTP Software*, 194 F.3d 185, 193 (1st Cir.1999). Furthermore, the pleading must go beyond mere allegations based upon information and belief, and specify the source of the information and the reasons for the belief. *Id.* In short, therefore, a complaint must satisfy four elements to meet the requirements of Rule 9(b). It must specify: (1) the allegedly fraudulent statements; (2) the identity of the speaker; (3) where and when the statements were made; and (4) why the statements were fraudulent. *In re Peritus Software Services, Inc., Securities Litigation*, 52 F.Supp.2d 211, 219 (D.Mass.1999).

■ The First Circuit's seminal case on PSLRA pleading standards is *Greebel*. Under this decision, the plaintiff must specify each allegedly false or misleading statement "including its time, place and content." *Greebel*, 194 F.3d at 193–94. Every claim that a statement or omission was fraudulent must be supported by facts showing exactly why it was misleading. *Id.* If claims are brought on information and belief, the plaintiff must "set forth the source of the information and the reasons for the belief." *Id.* at 194 (quoting *Roma-*

*ni*, 929 F.2d at 878). The inferences of scienter drawn from the facts must be "both reasonable and strong." *Id.* at 195–96. (internal quotation marks omitted).

## C. The Core Arguments

The Defendants assert several interrelated arguments. In essence, they argue that most of the complaint should be stricken for failing to plead in conformity with the PSLRA and Rule 9(b). Most of these arguments are incorrect, however, because they conflate the duty to identify the source of fraudulent statements with a broader—and inaccurate—duty to disclose the source of facts. Before applying the relevant legal standards to each allegedly false statement, the Court provides an overview of the common legal standards relevant to the various objections raised by Defendants.

### 1. Duty to Disclose Sources

■ The Defendants protest the nondisclosure of the Plaintiffs' sources. As this Court discussed at length in *Fitzer v. Security Dynamics Technologies, Inc.*, 119 F.Supp.2d 12 (D.Mass.2000), the "pleading with particularity" requirement of identifying the source applies to fraudulent statements and statements based on information and belief, not to the underlying facts supporting the inference that the statement was fraudulent. *Id.* at 20–22. In *Fitzer*, this Court concluded that "even if personal sources must be identified, there is no requirement that they be named, provided they are described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged." *Id.* at 22 (quoting *Novak v. Kasaks*, 216 F.3d 300, 313 (2d Cir.2000)).

In general, the Plaintiffs here disclose the identity of the makers of all the alleg-

edly false statements, and establish scienter from publicly available documents and identified sources—not confidential sources. Thus, the Defendants' core argument is without merit.

## 2. Information and Belief

The Defendants also argue that all of the "information and belief" statements ought be stricken.[3] The Court's order in the September hearing stated: "[w]here allegations are made on information and belief, or on investigation of counsel, the source of the information, to include content, time, place and speaker, and the basis for the belief must be stated with particularity." 09/25/2001 Hg. Tr. at 9–10 [Docket No. 46]. This comports with section 78u–4 of the PSLRA: "if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u–4(b)(1). Allaire argues that many assertions based on information and belief have not adequately identified the basis of the belief.

The prototypical "information and belief" statement is something on the order of: "on information and belief, 'party x' gave confidential information to 'party y.'" In such instances, it is relatively easy to apply the aforementioned mandates: the plaintiff must simply plead the factual basis that leads to the belief that such a transaction took place. The Plaintiffs, however, utilize a different style of "information and belief" statements. None of their allegations of wrongdoing—the false or misleading statements—are based on information and belief. Rather, a typical statement identified as based on "information and belief" is: "[t]he timing of Defendants' sales confirm their intent to unload substantial portions of their stock holdings prior to the revelation of the problems alleged by Plaintiffs." Compl. ¶ 41(c). This statement is followed with a series of factual statements, along with the sources of those statements (some of whom are unidentified former employees).

These statements are not the type of information and belief statements to which the statutes and the Court's order were addressed. Rather, these "information and belief" statements are essentially articulated inferences to be drawn from other facts. Indeed, in their definitional matrix,[4] the Plaintiffs explain that the symbol "IB" means "[i]nference pleaded on Information and Belief and supported by accompanying facts and investigation of counsel." Compl., App. A. Thus, the Plaintiffs recognized that they were identifying, under the rubric of "information and belief," reasonable inferences to be drawn from facts. Moreover, the Plaintiffs direct that the factual basis upon which to draw

---

3. The Court notes that so much of the complaint is based on attributable factual assertions that it seems unlikely that, even were all "information and belief" statements stricken, the motion to dismiss could be granted.

4. The Plaintiffs have formatted their complaint such that, at the end of each sentence or clause, a series of symbols is provided in carats. The symbols, which may be cross-referenced to a definitional table attached to the complaint, identify the source of the information and, or, the legal significance. Thus, for example, one sentence reads "Throughout the Class period, Defendants issued statements heralding, among other things, Spectra's ease of use <PR2/7/00>, ability to aid businesses in quickly implementing highly customized and complex·websites <10K, AR, PR2/7/00, PR8/22/00>, and that Spectra was ready to work 'out of the box.' <PR8/1/00>." Compl. ¶ 42. Cross referencing the definitional table, the meaning of the carat inserts is revealed. PR2/7/00 is the press release of Allaire Corporation dated February 7, 2000. 10K represents the Form 10K filed by Allaire on March 31, 2000.

the inference can be found in the accompanying facts—presumably those articulated in related paragraphs. Thus, in general, the Defendants' argument is misplaced: not only are the statements identified as founded on information and belief adequately pled (with respect to particularity and pleading of the source), but most of the statements are also not actually subject to such pleading formalities.

## 2. Puffing

■ The Defendants argue that many of the statements are mere puffing, and thereby unactionable. Puffing has generally been defined as "exaggerated, vague, or loosely optimistic statements about a company ...." *In re Boston Technology, Inc., Securities Litigation,* 8 F.Supp.2d 43, 54 (D.Mass.1998) (Lasker, J.). This Court has previously adopted—and will continue to apply—a two-step test for analysis of puffery claims: "first, the court should evaluate whether the statement is so vague, so general, or so loosely optimistic that a reasonable investor would find it unimportant to the total mix of information; second, the court should ask whether the statement was also considered unimportant to the total mix of information by the market as a whole." *Number Nine,* 51 F.Supp.2d at 20 (D.Mass.1999) (citing R. Gregory Roussel, Note, *Securities Fraud or Mere Puffery: Refinement of the Corporate Puffery Defense,* 51 Vand. L.Rev. 1049, 1064–66 (1998)) (quoting *Shaw v. Digital Equipment Corp.* 82 F.3d 1194, 1217 (1st Cir.1996), *superseded by* Private Securities Litigation Reform Act (PSLRA), 15 U.S.C. § 78u–4(b)(1)–(2) (1997)).

## 3. Duty of Disclosure v. False Statements

The Defendants further contest their duty to disclose, asserting that they were under no duty to disclose bad news. This, in general, misapprehends the present dispute. The nature of the Plaintiffs' case is not that the Defendants made false statements. While the Defendants may be correct that, absent any other statements to the public, they were under no obligation to disclose bugs in Spectra, that is not what Plaintiffs allege. Instead, what is alleged is that, while knowing Spectra was doomed—and hence that sales of Spectra would be doomed—the Defendants issued a continued series of press releases, SEC filings, earnings releases and the like which—fairly read—stated or implied that Spectra worked wonderfully, sales would be excellent, and that Allaire was a great company. As time wore on, and it became obvious that Allaire would not meet financial projections, Plaintiffs submit that Allaire intentionally continued to lead analysts to believe that all was well with Spectra sales and in the company as a whole. Thus, Allaire was under an affirmative duty to disclose. That is, having elected to comment on financial and product sales performance, Allaire was required to make full and accurate disclosures.[5]

## 4. Factual Contradictions

Last, the Defendants offer facts that they assert contradict the Plaintiffs' assertions. This, however, misapprehends the pleading posture. In a motion to dismiss, the Court assumes that all of the pled facts are true. The appropriate place to proffer

---

**5.** The Defendants appear to contest the viability of the core assertion. In essence, the Defendants argue that a suit regarding whether Spectra worked well is simply not actionable. Such an argument, however, mischar- acterizes the nature of the complaint. It is not that the product did not work; it is that the Defendants told the public that Spectra worked even though it did not.

contradictory facts is on a motion for summary judgment, which occurs after discovery.

The Defendants have elected not to analyze each statement, and merely contend that, as a whole, the statements fail. Accordingly, the Court examines only the earliest [6] claim in detail.

## D. Specific Statements

### 1. Spectra Performance

█ The Class purports to identify 17 statements which are false or misleading regarding the performance of Spectra. In general, the statements falsely trumpet three aspects of Spectra: (a) its ease of use, (b) its ability to aid businesses quickly to implement customized websites, and (c) that it was ready "out of the box." Compl. ¶ 42.

#### a. Press Release of December 7, 1999

A press release dated December 7, 1999 stated that "Allaire Spectra has completed successful beta testing at more than 500 sites.... The solution incorporates best practices in building and running large scale Web Businesses...." Compl. ¶ 43. The source is identified: namely, an Allaire Press release of December 7, 1999. The Court concludes that this adequately identifies the who, what, and where particularity requirements of Rule 9(b) and the PSLRA.

#### (1) False and Misleading

The Plaintiffs must also show that the statement was false and misleading. The

Plaintiffs contend that this statement was misleading because Spectra (a) was not *successfully* beta tested, (b) was incapable of running large scale web businesses without substantial customization, and (c) was not then immediately available (nor, the Plaintiffs allege, *ever* available during the relevant period) without substantial customization. *Id.* In support of these contentions, the Plaintiffs offer the testimony of (i) Ashley King, as well as information obtained from (ii) two unidentified former Allaire consultants, (iii) a former Allaire salesperson, (iv) a former Allaire technical recruiter, and (v) e-mail messages, posted by Allaire on its website, from disgruntled customers who complain about Spectra and the lack of customer service and the like. The unidentified persons are described, for instance, as:

> an internal Allaire corporate sales representative who worked at Allaire from December 1999 through February 2001. This sales representative is knowledgeable concerning allegations in the complaint pertaining to, among other things, communications to and from the sales force to Defendants, customer complaints regarding Spectra, customers returning Spectra because of its fundamental flaws, and the volume of sales of Allaire's Spectra, as detailed herein.

Compl. ¶ 140(d). The Court concludes that the facts alleged by the Plaintiffs are sufficiently pled to permit consideration—even absent identification of the source—of whether they create a reasonable inference that the statements were false or misleading.

6. As will become obvious, as time progresses the Defendant has more and more information regarding the poor performance of the product and the poor performance of the company. The publicly made statements, however, disclose none of the negative information until September 18, 2000. Thus, as the allegedly false statements are made later

and later temporally, the inferences of falsity and scienter grow stronger and stronger. As the Court ultimately concludes that the earliest allegedly false statement is actionable and properly pled, there is less need for an exhaustive evaluation of the subsequent statements.

The allegation of falsity is not that Spectra was not beta tested [7] on 500 sites, but that the adjective "successful" was false because, given the problems later found with the product (as established by the proffered statements of the unidentified salesmen and the like), the beta testing could not have been "successful." Read in context, the sentence is part of an announcement that Spectra is ready for sale immediately. The second allegedly false statement—that Spectra was capable of running large business web sites—is also made in the same context. Accordingly, together, the proper inference to be drawn from the allegedly false statements is that the program is ready for sale and, to some degree, works.

No one contests that Spectra was actually available for sale in December, 1999, and, in fact, that it was sold in December, 1999. *See, e.g.,* Compl. ¶ 67 (discussing sale to Chicago Mercantile Exchange in August, 1999, and delivery in December, 1999). The Plaintiffs do, however, present extensive evidence that Spectra was not operable—at least not as its customers and investors understood that it should operate. In essence, the Plaintiffs' facts can be divided into two broad categories. One category is the external evidence that Spectra was a poor product—e-mails from customers, customer service records, internal communications regarding "fixes," and the like. These facts adequately demonstrate that the product did not work, and that testing would have revealed this. Thus, the facts support the inference that at the time these communications were made, Spectra was seriously flawed.

These facts also support the strong inference that the Defendants knew the statement was false when issued. The Court finds it reasonable to infer that the individual Defendants—senior company executives—were informed of the status of Spectra, as the complaint alleges. *See, e.g.,* Compl. ¶ 173. Indeed, it is simply inconceivable that management could not have known that the program did not work satisfactorily. Accordingly, the Court finds that there are ample facts pled from which to conclude that the Defendants knew the statement was false when made.

Most of these facts, however, are established through communications dated after the press release at issue. None of the facts pled—with the arguable exception of the press release's statement about Spectra's "successful" beta testing, discussed below—indicate that the Defendants knew, at the time of the press statement, that it contained false statements. Nevertheless, so it is argued, the subsequent dire performance of the product was so bad that it supports an inference that the Defendants must have known the dire truth when they made the statements. This type of argument is referred to as "fraud by hindsight." *See Peritus,* 52 F.Supp.2d at 223–24.

Generally (but not always), fraud by hindsight is insufficient to meet the pleading requirements of Rule 9(b). This, however, is not the typical fraud by hindsight case. Fraud by hindsight claims are insufficient if a changeable condition exists and there is no evidence or facts pled which demonstrate that the changeable condition did not in fact change post-statement. Absent such facts, there is no basis to sup-

---

**7.** Beta means "experimental versions not ready to be released to the public." Compl. ¶ 73. Similarly, "beta testing" means "a test of machinery, software, etc. in course of final development, carried out by a party or parties unconnected with the developer." Oxford

English Dictionary, 2d ed. (1989). "Alpha testing," by contrast, is a "test of machinery, software, etc. in course of development, carried out in-house by the developer before the product is made available for beta testing." *Id.*

port the inference that the statement was false at the time of issue. Thus, for example, in *Fitzer*, the claimed fraud was that statements made early in the financial reporting period indicated the company was in good health, while the facts at the end of the period showed the company was not. 119 F.Supp.2d at 20. Fraud by hindsight, alone, therefore could not suffice in *Fitzer* because it was entirely possible that the decline occurred after the statements were made. *Id.* at 21.

In this case, however, the claim is that the product did not work at time "x." The proof offered to prove that the product did not work at time "x" is that, at time "x + 1," the product did not work. As this is not a deteriorating product, e.g., a car, it is highly unlikely—though not inconceivable—that the product worked properly in December, but did not in January. Accordingly, in this case, objections to the "fraud by hindsight" theory of liability are inapplicable.[8]

There is, additionally, one fact pled that, temporally, is pre-press-release—the allegation that the Defendants misrepresented the success of the beta testing that was conducted prior to the press release.[9] This, accordingly, casts doubt on the characterization of this case as simply one of fraud by hindsight. For this not to be a case of fraud by hindsight, however, the Court must infer that, if the testing did indeed occur, the Defendants knew the

results, and that those results would have shown the defective nature of the product. The Court considers this a reasonable inference. First, this allegation is made in the section detailing facts providing a strong inference of scienter. Compl. ¶ 26, 27. Moreover, the Court views it reasonable to infer that the senior executive officers of a company were informed of the test results relating to a major product line. Consonant of its obligations in a motion to dismiss setting, the Court draws such inferences and concludes that the facts pled support a strong inference of falsity. As these facts relate to what all concerned parties viewed as a key profit driver for Allaire, it appears beyond peradventure that the statements were material.

Thus, viewed either as a fraud by hindsight claim or otherwise, the Plaintiffs have adequately pled facts leading to a strong inference that the facts were false when made.

### (2) Scienter

Scienter is "a mental state embracing intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n. 12, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976). The most damning facts pled in the complaint can be summarized as follows.

*See Number Nine*, 51 F.Supp.2d at 15–16 (discussing *Shaw*).

---

**8.** Interestingly, the "fraud by hindsight" doctrine is applied in both the factual support context and the scienter context. This is intentional. In the factual support context, the doctrine prevents drawing an inference that the statement was false at the time made merely because a changeable condition later changed. In the scienter context, the doctrine prevents inferring that a party knew the statement was false at the time it was uttered merely because of later context. In the scienter context, therefore, the doctrine is adjusted to reflect temporal proximity to the statement.

**9.** There is an inference that Ashley King, the Spectra developer, would testify that the Defendants were well aware of the defects with Spectra when the statement was issued. There is no alleged statement, however, attributing such knowledge to King. Given the heightened pleading requirements, the Court cannot consider the impact such testimony might have.

Spectra was released in December, 1999, and was recognized as the future of Allaire. The product, however, did not work—customers, distributors, sales personnel, and technical personnel all knew and discussed Spectra's inability to operate. The Defendants, aware of this, began to sell their Allaire shares during the first three quarters of 2000. During the selling campaign, the individual Defendants sold a combined 1 million plus shares, netting over $53,000,000.00. During the campaign, the share price slowly decreased from approximately $65.00 to $33.00 per share, at which point Allaire underwent a stock split—lowering the per share price to approximately $17.00—and announced its third quarter operating results, wherein it disclosed the significant problems with Spectra, at which point the share price dropped to approximately $10.00 in one day. None of the individual Defendants had ever previously engaged in open market sales of Allaire securities. During the approximately nine-month period during which the individual Defendants sold their shares—some selling as much as 40% of their entire holdings—Allaire, through the individual Defendants speaking as corporate officers and as a corporate entity, continued to issue press releases and gave interviews which touted the product (which did not work) and the stock (which they described as undervalued).[10] As the full impact of the Spectra failure came to light, the Individual Defendants consummated a change in control transaction, whereby another company acquired Allaire at approximately $9.00 per share. The circumstances, timing, and content of the statements—namely, the way they appear to have addressed exactly the sort of rumors one would expect were floating in the marketplace regarding Spectra, and

thus kept the stock artificially overvalued while insiders sold out—support a very strong inference that the statements were made with the requisite nefarious intent: scienter. The Plaintiffs have more than established scienter.

Having established that the motion to dismiss will be denied, at least partially, the Court offers only a brief analysis of the remaining allegedly false statements.

### b. January 26, 2000 Press Release

Allaire's January 26, 2000 press release stated that Spectra has "exceeded our expectations since it became generally available in December." Compl. ¶ 44. This is clear puffery and, therefore, not actionable. It is hard to imagine a more subjective or vague statement than "exceeded our expectations." This is precisely the type of statement that the marketplace views as pure hype, and accordingly discounts entirely. Moreover, no reasonable investor would find such a statement important to the total mix of information. *Boston Technology*, 8 F.Supp.2d at 52. Furthermore, technically, Spectra probably did exceed Allaire's expectations since becoming available in December: the program did not work, yet customers were buying it.

### c. David J. Orfao's Interview of January 27, 2000

Defendant David J. Orfao ("Orfao") was Allaire's President, Chief Executive Officer, and a company director. Comp. ¶ 12. In an interview on the Bloomberg Forum that occurred in January of 2000, Orfao stated that Spectra was fueling growth. Compl. ¶ 45. This statement is actionable. It is a precise statement as to the basis for

---

**10.** This factual pattern is established using the e-mails obtained from Allaire's website, SEC filings, and press releases. Thus, scienter is not established through "information and belief" pleadings or from unnamed sources.

profit growth which, if the assertions about Spectra's inability to operate are true (and indeed, the Court must make all inferences in the Plaintiffs' direction), could not have been believed by its maker—at least not without recklessness on his part.

#### d. February 7, 2000 Press Release

A press release dated February 7, 2000, touting the initial acceptance in the marketplace of Spectra, stated that: "Major [companies] ... are standardizing on the Allaire Spectra platform to bring their business to the web *faster than ever before.*" It further stated that customers were looking for a certain types of product to enable the extension of customer's businesses into e-commerce quickly and easily. Compl. ¶ 46. (emphasis added). As to the second portion of the statement, there is simply no indication that customers were not looking for a platform quickly and easily to extend into e-commerce. Accordingly, there was no falsity in that portion of the statement.

The first part of the statement, however, asserts that the platform will bring their business to the web faster than ever before. In *Number Nine*, 51 F.Supp.2d at 18, this Court noted that when a company initiates a comparison with other companies' products, it must fully disclose. In *Number Nine*, the comparatory language was that Number Nine offered a "broad product line" and was therefore an attractive investment. *Id.* at 19. The language implicitly compared Number Nine's product line with other companies. Here, exactly such a comparison was made or implied. "Faster than ever before" clearly indicates that this product is faster than any previously available product. Accordingly, in the motion to dismiss context, this constitutes an actionable statement.

#### e. The 1999 Annual Report

The 1999 Allaire Annual Report (Form 10-K) was filed on March 31, 2000. Compl. ¶ 47. In it, Allaire described its product line and included several allegedly false representations regarding Spectra.

First, it described Spectra as providing "[a] comprehensive software platform that enables customers to rapidly build, deploy, and manage Web applications ..." *Id.* This is allegedly false because Spectra did not work well; therefore, customers could not build deploy or manage web applications, and certainly could not do so rapidly. This statement, however, is pure puffery. The evidence shows that Spectra did not operate as hoped, but that eventually it could be made to work—with customization. Unlike in *Number Nine*, this statement included no comparatory language. It merely contained the sort of vaguely optimistic platitudes that are constantly bandied about the marketplace, and thus are treated by both reasonable individual investors and the market as a whole as irrelevant.

The annual report further states that "[t]he products in our platform are not constrained by a need to support or promote a particular legacy technology or a particular operating system." Compl. ¶ 47. This is actionable. The facts pled indicate that, to the contrary, Spectra did require a particular legacy technology— ColdFusion. This is a specific, fact based statement and is not puffery; a reasonable investor would have considered this important, as would the market as a whole, in assessing the future sales and service potential of the product.

The company's annual report also provided a description of Spectra. In the section entitled "Features and technologies designed to reduce time to market," Spectra was alleged to "speed[ ] development by providing packaged functionality based

on industry best practices." Compl. ¶ 47. This is, again, the sort of vague claims that the market, and individual investors, ignore. This is not the sort of specific, comparatory language contemplated by *Number Nine*, and is therefore puffery.

Further, the annual report stated that "Spectra provides system administrators, Web developers and business users and managers with the necessary pre built software components and visual tools to rapidly deploy and manage large scale publishing efforts, e-commerce sites, enterprise portals, and intranets." Compl. ¶ 48. This is allegedly false because Spectra's operation required special training (and thus business users could not operate it), and because the program did not work. This is a detailed statement about the abilities and usage of the program, made at least three months after everyone at Allaire allegedly knew that the product did not work and that it so difficult to use that only specially trained individuals could ever hope to use it properly. This constitutes an actionable fraud statement.

A table in the annual report also describes Spectra's abilities. Compl. ¶ 49. One of the columns describes the typical application of the program; the other describes the target purchaser for that application. Thus, one such set of data indicates that a typical application is hosting internet portals, and that the target users of that application are internet service providers. These statements are allegedly false because Spectra could not function without extensive customization. The table, however, does not discuss customization or the need for it. Moreover, the table identifies the target uses and customers. In that respect, the statement is not false—these were the target customers. This is puffing, as it is not specific enough for any reasonable investor, nor the market, to rely upon. No comparison is made

to other products, nor are any specific claims regarding the performance of Spectra made.

Spectra had also incorporated a special subprogram called WDDX into its program. WDDX allegedly "enabl[ed] business to business commerce applications." Compl. ¶ 50. WDDX, however, did not permit business to business applications because it is incompatible with other important computer languages, such as Java. As this is a specific statement regarding the capabilities of Spectra, this statement is actionable and not mere puffery.

The annual report also stated that "Allaire offers a powerful packaged system, Allaire Spectra, that dramatically reduces time to market with a modular and customizable services for content management, e-commerce, and personalization." Compl. ¶ 51. This statement was allegedly false because Spectra, due to its complexity and nonfunctionality, took much longer to develop websites than other systems. Unlike "broad product line" or "faster than ever," this language invites no comparison. Instead, this is precisely the sort of vaguely optimistic language that investors and the market have come to know and dismiss in making their investment decisions. As such, this is merely puffery, and cannot form the basis for a securities action.

### f. April 18, 2000 Press Release

A press release dated April 18, 2000 stated that Allaire was responding to businesses' needs "to enable companies to grow their online businesses faster and more cost effectively than ever before." Compl. ¶ 52. This statement simply is not false. The Plaintiffs assert that this statement is false because Spectra did not enable companies to grow online faster than ever before. This argument, however, ignores the full context of the sentence. The sentence describes the customers'

needs: "to grow their online businesses faster and more cost effectively than ever before." *Id.* There is no indication that these were not the customers' needs, and therefore this statement is not actionable.

In discussing its first quarter 2000 financial results, the press release went on to attribute growth to factors "including impressive win rates for Allaire Spectra," referring to substantial numbers of former clients converting to the new product. *Id.* The allegation of falsity is that the Defendants knew that the win rates were only temporary because customers would return the product as soon as they realized how poor it was. Moreover (and more importantly) facts pled indicate that at the time of the statement the Defendants already knew that the win rates had dramatically slowed, and thus the statement omitted the current truth. This statement is not puffery, and is actionable.

### g. May 1, 2000 Press Release

A press release dated May 1, 2000 described various reasons for recently negotiated licensing agreement with another firm, which would "leverage SiteMinder's leading secure portal management infrastructure to enable single sign on, authentication management, and entitlement management across ColdFusion and Allaire Spectra applications." Compl. ¶ 53. This was mere puffery. Moreover, the statement is not false. The aspiration of the agreement was to leverage various expertise.

More specific portions of the release, however, do contain allegedly false statements that are actionable. One portion of the release asserts that the product "seamlessly integrate[s] with the ColdFusion and Allaire Spectra development environments," and goes on to describe some of the seamless integration benefits. *Id.* This is allegedly false because, at the time of the release, Allaire already knew the described product caused many of the problems with Spectra—hence Allaire knew there would be no seamless integration. This constitutes an actionable statement.

### h. May 3, 2000 Report

In a May 3, 2000 report of European Growth, Allaire stated: "Allaire is winning because our proven technology enables companies to implement solid enterprise wide solutions on time and within budget." Compl. ¶ 54. This is allegedly false because one of the key complaints regarding Spectra was that it could only be installed with extensive consultant support, at the high cost of $2500 per day—thus blowing budgets. Furthermore, the technology was not proven—on the contrary, it did not work. This is an actionable statement. It is not mere puffery, and the facts supporting inference of the requisite scienter are pled, given the context of the allegations in this suit. The Plaintiffs assert that Spectra did not work, and that customers and insiders knew it. In order to prolong the insiders' ability to sell out their holdings in Allaire, insiders caused Allaire to issue false press releases, and the like, which countered criticisms of which the market may have gotten wind. Thus, while in other contexts a statement such as "proven technology" might not be actionable, in the context of allegations that the statement was issued specifically to camouflage known product deficiencies, it is actionable.

### i. May 17, 2000 Partnership Announcement

In a May 17, 2000, partnership announcement, Allaire reiterated the claim that Spectra "dramatically reduce[d] time to market" and provided a platform to develop "scalable web applications." Compl. ¶ 55. This statement is allegedly

false because Spectra's problems prevented it from dramatically reducing time to market, and because ColdFusion had scalability problems. Both of these statements are actionable. The phrase "dramatically reduces" is an implied comparison to the prior state of affairs. Moreover, the Plaintiffs' allegations are that Allaire knew Spectra did not work, and yet still stated that the program dramatically reduced time to market. As to the second portion of the statement, again, this is allegedly directly contrary to the known capabilities of the product. That the statements are promulgated in a press release addressing other issues is irrelevant—the information is still introduced into the marketplace. Accordingly, this is an actionable statement.

### j. May 22, 2000 Press Release

In a press release dated May 22, 2000, Allaire alleged that business-to-business ("B2B") customers were "leveraging the Allaire Internet business platform to successfully bring their businesses online faster and more cost effectively that ever before." Compl. ¶ 56. This statement was allegedly false because Spectra did not enable companies to build B2B websites faster than ever before. As previously discussed, see *supra* at 24—25, the use of "faster than ever before" is an implied comparison, and thus the statement is actionable.

The press release went on to describe Spectra as a "highly effective platform for getting to market first" and a "scalable deployment platform." *Id.* This statement is allegedly false because there were significant scalability problems. As previously discussed, see *supra* at 31, this statement is actionable.

### k. July 20, 2000 Press Release

A July 20, 2000 press release announcing second quarter financial results dis-

closed positive results. The results were attributed to "the fact that we address one of the biggest challenges that companies face: time to market." Compl. ¶ 57. Again, this is an actionable statement. The facts pled indicate that purchasing Spectra did not assist companies in reducing time to market, because Spectra required extensive technical training to use and customized installation.

Again, although this sort of statement might usually be considered puffery, here the facts pled support an inference that the statement was made to foster a false market perception of the performance of Spectra while Allaire insiders unloaded stock on an unsuspecting market. It is a reasonable inference that statements such as this were calculated to influence the market. In this limited context, these statements are not mere puffery but instead constitute actionable statements.

On the same day that the press report was released, the Defendants hosted an analyst conference call to discuss the previous quarter's financial results. During the conference call, the Defendants told analysts that 109 units were sold in the previous quarter and that the future sales pipeline for the third quarter was greater than that of the second and first quarters. *Id.* These results were allegedly manipulated by the intentional delay of first quarter sales until the second quarter, in order to demonstrate momentum growth. Furthermore, the Defendants knew that there were few sales in the pipeline, and thus that the statements were false. This is a classic examples of a statement that requires full disclosure. In this instance, the Defendants allegedly failed fully to disclose adverse knowledge in their possession. This statement, accordingly, is actionable.

### 1. July 21, 2000 Interview

In an interview on July 21, 2000, Orfao stated, in several responses to questions, that Spectra sales were expected to continue to grow earnings throughout the year. Compl. ¶ 58. This was allegedly false because the Defendants already knew that Spectra demand had significantly fallen off because of the product's defects. Again, this statement is the classic type of statement that requires full disclosure to avoid being misleading. Accordingly, this statement constitutes an actionable statement.

### m. August 1, 2000 Press Release

In an August 1, 2000 press release, the Defendants stated that "over 70 Allaire Spectra customers have 'gone live' and brought their businesses to the Web faster and more cost effectively than ever before." Compl. ¶ 59. The first part of this assertion is not alleged to be false—apparently seventy customers did use Spectra—and is thus not actionable. However, as previously discussed, *see supra* at 24—25, the use of "faster than ever before" is an implied comparison with every product previously available, as is "more cost effectively"; thus, these portions of the statement are not puffery, and the statement as a whole is therefore actionable.[11]

### n. August 22, 2000 Press Release

An August 22, 2000 press release stated that by "[p]roviding business solutions on top of application servers, packaged applications dramatically reduce time to market by providing prebuilt systems based on industry best practices and modular, customizable services." Compl. ¶ 60. This is allegedly false because Spectra did not reduce time to market. The statement, however, makes no reference to Spectra—

only to packaged applications generally. As it is apparently undisputed that packaged systems generally can reduce time to market, that statement is not actionable.

The press release goes on to state that "[t]he Allaire Business Platform includes a powerful packaged system, Allaire Spectra, for building solutions ranging from site publishing to business-to-business commerce to customer self-service." *Id.* This is allegedly false because Spectra did not operate on the common server for business websites, Solaris. Whether this statement intended to imply that Spectra—a packaged system—is a packaged application that dramatically reduce time to market—is unclear. What is clear, however, is that the statement describes the intended capability of Spectra, not its actual performance. Thus, this statement is not actionable. Moreover, this is precisely the type of vague platitude that the market, and individual investors, ignore.

### 2. Ability to Support Products

 The second category of allegedly false and misleading statement relates to Allaire's ability to provide customer service support. The only statement identified as false or misleading is in Allaire's 1999 annual report, filed on March 31, 2000. There, in generally touting its abilities and probable earnings growth, Allaire stated: "Our customers have a broad choice of support options depending on the level of service desired. We maintain a technical support hotline staffed by engineers from 8:00 a.m. to 8:00 p.m...." Compl. ¶ 83. Spectra is "complemented by high-quality consulting, training, and support offerings that support the full life

---

11. Further portions of the press release quote a customer touting the benefits of Spectra. The comments of customers on their own clearly cannot be the basis of liability for Allaire; the customer, not Allaire, issued the statement.

cycle of design, development, testing and deployment." *Id.*

The Plaintiffs, however, have noted that, prior to the date of the annual report, Allaire was aware that it lacked adequate support staff, and indeed had shut down its customer support center in order to focus on trying to fix the Spectra program faults. These facts are specifically pled, and provide an adequate basis to infer fraud. For instance, one of the Spectra developers, Ashley King, advised the Defendants that the customer support center was inadequate. *Id.* ¶ 85. During this time, when Spectra sales were allegedly booming, the call center had only two technical support personnel. *Id.* ¶ 86. Moreover, at this time, the individual Defendants had already commenced their selloff of Allaire shares.

Accordingly, the Plaintiffs have alleged sufficient facts to infer that the Defendants issued a knowingly false statement with scienter. This statement, therefore, is actionable.

### 3. Ability to Sell Spectra into the Existing Customer Base

█ In its annual report, Allaire stated: "We believe the broad customer base and developer support of our web application servers enhance our ability to introduce complementary products." Compl. ¶ 95. Later, Allaire stated that its leadership position gave it a "competitive advantage" over rivals, and reiterated that the broad customer base "enhance[s] our ability to introduce complementary products." *Id.* ¶ 96. These statements are allegedly false because the existing customer base bought low priced products, and Spectra was quite expensive. Further, the existing product—ColdFusion—was simple to use, whereas Spectra was not. Last, Spectra was allegedly redundant with respect to most existing customers' needs.

Although these statements are prefaced with "we believe" and thus are statements of opinion, they are nevertheless actionable. The Plaintiffs have alleged that the Defendants lacked any rational basis upon which to base such a belief. Further, the Plaintiffs have alleged that the facts known to the Defendants regarding Allaire's existing customer base clearly indicated that it would not be a lucrative source of Spectra sales. Moreover, these are exactly the types of statements on which investors and markets rely. Allaire, in its annual report, provided explicit reasons why it felt it exercised a competitive advantage over competitors and therefore why it was positioned to achieve greater growth and market dominance. Accordingly, the Plaintiffs have adequately pled a cause of action with respect to these statements.

### 4. Allaire's Position during the Third Quarter 2000

During the third quarter of 2000, the Plaintiffs allege that the Defendants knew the ship was sinking, but told no one while they sold out their positions in Allaire stock. Moreover, Defendants not only told no one of the troubles, but also continued to issue statements saying everything was rosy. An August 1, 2000 press release stated that "[w]e are extremely pleased with the rapid acceptance and adoption of Allaire Spectra in the Marketplace." Compl. ¶ 105. This is allegedly false because, by this time, it was obvious that the marketplace was rejecting Spectra, and Allaire could not have been happy about that response. Similarly, in an August 2, 2000, interview with the Wall Street Transcript, Jeremy Allaire (Allaire's co-founder, Executive Vice President, and Chief Technology Officer), in response to a question about the company's growth goals, referenced analysts' ex-

pectations for 100% growth year over year, and stated "we definitely think that is achievable." Compl. ¶ 106. By this time, however, Allaire knew that sales forecasts could not be met and therefore that revenue growth would be nowhere near what the analysts were forecasting. Each of these statements are material, allegedly false, and made in a context that supports a strong inference of scienter. Accordingly, the Plaintiffs have adequately pled a cause of action with respect to these statements.

### E. Loss Causation

■ The Defendants also argue that the Complaint fails to make a connection between the alleged misstatements (namely, misrepresentations about Spectra's true flaws) and the alleged loss, the stock price's plunge after the September 18, 2000, and the announcement of an inability to meet third quarter estimates. This contention misapprehends the nature of the suit.[12]

The Defendants argue that the Plaintiffs' loss causation analysis rests on the following theory: The stock price started off inflated because of false expectations in the marketplace as to Spectra sales. These expectations were fostered and fueled by the Defendants' false and misleading statements. Distributors and customers knew Spectra did not work but told no one, instead voting with their purchasing power to turn away from Spectra. This in turn caused a slowdown in Spectra sales, which resulted in Allaire's inability to meet third quarter estimates, which led to a precipitous stock price decline. The Defendants assert that there is simply no factual basis

pled upon which to connect the stock price decline to the alleged misrepresentations, especially in view of the intervening independent actions of distributors and customers.

Again, this Court must draw all reasonable inferences from the facts pled in favor of the Plaintiffs. See A.T. Cross, 284 F.3d at 79 (holding that the district court did not give all reasonable inferences to the plaintiff when analyzing the sufficiency of facts pled to demonstrate fraud, and reversing the district court's dismissal). Under this standard, here there are indeed sufficient facts pled to determine that Spectra did not work as advertised. E.g., Testimony of Ashley King. There are also sufficient facts pled to infer that market analysts relied on the spectre of Spectra sales to value Allaire stock. E.g., analysts reports tracking quarterly sales of Spectra. Finally, once Allaire disclosed the poor sales and the fact that earnings estimates would not be met, the stock price decreased significantly. Drawing all inferences in favor of the plaintiff—as the Court must—it is a reasonable inference that the stock price decline on September 18, 2000 took place because earlier the market had been led, falsely, to believe that Spectra sales were good and earnings estimates would be met. Under the tenets of free market economics, sales will decrease if product quality goes down, and thus it seems reasonable to infer—based on the facts pled—the poor earnings were the result of the product "bugs," which were hidden.

As a truly practical matter, had any analyst been told that the product could

---

12. As a practical observation, throughout this time the stock price of Allaire was dropping from roughly $65 to $20 per share (ignoring the effect of the stock split). Thus, the probable truth is that the market was slowly discovering that the product did not work. Further-

more, as most of the insiders were substantial holders of Allaire stock, they had to report stock sales to the SEC. Thus, as the insiders bailed out to the tune of $53,000,000, elements of the market were no doubt figuring out that Allaire might not be a great stock.

not be made to run absent time-consuming and costly customization, contrary to its advertised properties, that analyst would have thought the information significant. Obviously, this would have impacted sales, which in turn drive revenue and profits. To suggest otherwise is to insult the Court's intelligence. Thus, to the extent that the Defendants contend that there are no explicit facts proving the steps they assert are necessary to show loss causation, they are wrong. To the extent that the Defendants point to the lack of a sentence in the complaint alleging the inference to be drawn, their arguments are unavailing. While the facts must be pled with particularity, the inference may be drawn by the Court.

The Defendants also argue that the alleged losses are not specific enough. They cite various cases, including *Peritus*. There, this Court concluded that generalized claims that "licenses ... were not generating significant revenue," that "sales were floundering" and that "defendants backdated contracts" were insufficient to demonstrate scienter. *Peritus*, 52 F.Supp.2d at 225. *Peritus*, however, did not reach the loss causation context. The reason the alleged facts were not adequate in *Peritus* is that scienter requires a "strong showing." Loss causation, however, does not. *Id.* at 226. Accordingly, what is insufficient to demonstrate scienter may nonetheless be sufficient to demonstrate loss causation.

Furthermore, in *A.T. Cross*, the First Circuit clarified the specificity required for the context of facts proving fraud. 284 F.3d at 81 (rejecting district court's dismissal of claims for lack of specificity of the alleged losses, and stating that "*Greebel* did not hold that a plaintiff, before discovery, must in every case allege the amount of overstatement of revenues and earnings in order to state a claim ....").

The First Circuit thus implies that when the factual basis of a complaint rests on a small core of assertions, they must be pled with exceptional specificity; but when there is a core of well pled facts that support an inference of scienter, ancillary facts need not be pled with such detail. This complaint presents a core of well-pled facts that support a strong inference of scienter, and sufficiently articulates its causation theory. The Plaintiffs have adequately pled loss causation—taking the inferences their way—to survive a motion to dismiss.

### F. Analyst Reports

 The Defendants also claim that they are not liable for analysts' reports. In *Boston Technology*, 8 F.Supp.2d at 54, Judge Lasker considered liability for a securities issuer's failure to correct an analyst's statements, and concluded that the First Circuit would indeed impose such liability—in accordance with the majority of circuits having considered the issue—when presented with such a case. To incur liability for an analyst's statements, a defendant must "entangle" itself with the analysts. *Id.* Entanglement may be proven in either of two ways: first, "by the issuer having either 'fostered,' 'induced,' or otherwise caused the statement to be made in the first place"; or, second, by "having adopted, ratified, or otherwise 'endorsed' the statement after it was made." *Id.* (citing cases). In this case, the facts pled establish the first method of entanglement.

 Jeremy Allaire and David Gerth (Allaire's Vice President of Finance and Operations, Chief Financial Officer, and Treasurer) met with analysts from Hoak Breedlove in the final days of August 2000. Compl. ¶ 107. At this meeting, both individual Defendants gave information to the analysts that caused stock reports to be issued. In the report, the analysts stated,

"We recently spent time with Jeremy Allaire, CTO, and David Gerth, CFO, of Allaire. Combined with our 'channel checks,' we believe that not only is the current quarter on track to exceed our estimates, but also that the company is clearly undervalued . . . ." *Id.* (quoting analyst report). Thus, the analysts' report identifies the time and place of the meeting, as well as two of the individual Defendants as the source of the information. This makes clear that the information was supplied by the Defendants, and fostered or induced the analysts' comments. Accordingly, this paragraph pleads sufficient entanglement with the analysts to engender liability.

At a business conference on September 11, 2000, Orfao allegedly stated that he believed the quarter remained back-end loaded with a number of deals left to close to achieve Spectra's $36.7 million total revenue and $0.07 EPS estimate. In Credit Suisse First Boston's September 12, 2000 report on this conference, Orfao was provided as the source of this information: "David Orfao, CEO, presented yesterday at our [business conference]. We believe the quarter remains back-end loaded with a number of deals left to close to achieve our [revenue estimates]." *Id.* (quoting CSFB report of Sep. 13, 2000). The complaint separately alleges that Orfao made a presentation at the conference and made the above statements. Thus, the time, place, and context of the statements have been alleged and entanglement established. It is a fair inference, based on the facts pled, that the analyst obtained its information from Orfao—and that fact is indeed pled. Accordingly, liability for the analyst reports is viable.[13]

---

**13.** To the extent that the Plaintiffs attempt to argue adoption of false statements, the Court rejects this argument. The one proffered statement of adoption, presented in paragraph 106 of the complaint, occurred on August 2, 2000. As the contested analyst's statements did not occur until late August or September of 2000, the proffered statement of adoption could not have adopted the false statements as to which this complaint is made.

## G. Individual Defendants

As described above, Orfao, Gerth, and Jeremy Allaire are each alleged to have made false and misleading statements. The time, place, and manner of making the statements is pled, as are facts that indicate the statements were false or misleading when made and thus give rise to a strong inference of scienter. Accordingly, as to these three, the Defendants' motion to dismiss was denied. It is true that no specific false or misleading statements have been attributed to the remaining Individual Defendant, Joseph Allaire (Allaire's co-founder, Chairman of the Board, and Executive Vice President). Nonetheless, he remains liable under the "group pleading" and "control person" doctrines, just as are the other three Individual Defendants, as explained below.

As this opinion makes clear, the vast majority of the Defendants' false or misleading statements are contained in either SEC filings such as the 1999 annual report or in press releases. In the case of *In re Raytheon Securities Litigation,* 157 F.Supp.2d 131 (D.Mass.2001), Judge Saris examined the "group-published information doctrine," otherwise referred to as the "group pleading doctrine," *id.* at 152. Judge Saris concluded that the First Circuit had determined that the doctrine, established prior to the enactment of the PSLRA, survived such enactment. *Id.* This Court concurs with Judge Saris' analysis.

The group pleading doctrine permits "the plaintiff . . . [to] impute false or

misleading statements conveyed in annual reports, quarterly and year-end financial results, or other group-published information to corporate officers." *Id.* The alleged statements herein are annual reports, SEC filings, and press releases. The first two are contemplated within the group pleading doctrine. Press releases are also within the rubric of "other group-published information." Judge Saris' inclusion of the phrase "other group-published information," contemplates that group-published information outside of the SEC filing context is within the doctrine. To permit the individual defendants to cause false communications to issue to investors, yet escape liability because investors, prior to discovery, cannot identify who generated the press release, would be inconsistent with the intent and functions of the securities laws.

■ To plead properly within the group pleading doctrine, a plaintiff must plead with particularity that each individual officer knew of the fraud. *Id.* The Plaintiffs have done just that. The Plaintiffs allege that each individual defendant—Orfao, Gerth, Jeremy Allaire, and Joseph Allaire—was provided with copies of the SEC filings and press releases prior to publication and had the opportunity and ability to correct them. Compl. ¶ 173. Each individual Defendant is alleged to be a senior executive of the company, with access to the relevant material non-public information. *Id.*

■ Moreover, the Plaintiffs also assert a "control person" cause of action against the individual Defendants pursuant to Section 20(a) of the Exchange Act. Compl. ¶ 175. Control person liability, unlike primary liability, does not require that individuals have issued the false or misleading statements, but merely that the individuals have controlled the entity that issued the statements. Here, control is

sufficiently pled, and thus the Plaintiffs have adequately pled both a cause of action for primary liability under the group pleading doctrine, and a cause of action for control person liability. Accordingly, the motion to dismiss with respect to Joseph Allaire was also denied.

## IV. CONCLUSION

Here, several of the allegedly false statements that Plaintiffs identify are of the classic securities fraud variety. Many of the other statements that this Court has ruled actionable fall right on the borderline. In this case, however, it is alleged that the Defendants did everything possible to prop up the stock price while insiders sold out. Thus, given the facts pled regarding Defendants' successful sale of shares, there is adequate groundwork to infer scienter with regard to the borderline statements.

It is difficult to conceive of a complaint pled with more particularity than the one presented. The only way that this complaint could have been more explicit would be if it revealed the identities of several sources. As it is, this complaint is one hundred and eleven (111) pages long, identifies the source of all factual assertions, and is replete with repleading of the same facts, merely to satisfy formalistic requirements. In many respects, if this complaint is not specific enough, no complaint is. Accordingly, this Court has rejected most of the Defendants' arguments.

Essentially, the Plaintiffs invested in a company which promised to build the best mousetrap ever. When it was done, the mousetrap was ugly, did not catch mice, and, as word got out, people stopped buying. Did the company try its best, but fail? Or did the company deliberately dupe the investors? The Plaintiffs plead—and taking all factual inferences their way, they have shown—that when the Defen-

dants realized Spectra would not work, they elected to dupe the investors, lying about its progress and misleading the public.

There is nothing to preclude the Defendants from reasserting their arguments, consonant with counsel's obligations pursuant to Federal Rule of Civil Procedure 11, at the summary judgment stage, since the inferences that the Court is obliged to draw in the motion to dismiss context may not be drawn there.

For these reasons, the Court denied the Defendants' motion to dismiss.